James CISSELL, Trustee, Plaintiff,

v.

The FIRST NATIONAL BANK OF CINCINNATI, Defendant.

No. 7886.

United States District Court,
S. D. Ohio, W. D.

April 9, 1979.

---

Robert R. Lavercombe, Cincinnati, Ohio, for plaintiff.

A. Arthur Speigel, Cincinnati, Ohio, for defendant; William McD. Kite, Cincinnati, Ohio, of counsel.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID S. PORTER, Chief Judge.

This is an action by the Trustee in Bankruptcy for World Academy, Inc. (World), and its subsidiaries to recover certain payments made between March 13, 1970 and July 1, 1970 by World to the First National Bank of Cincinnati (Bank). It is contended that these payments (totaling $518,143.65) are voidable preferences within the meaning of § 60(a) and (b) of the Bankruptcy Act, 11 U.S.C. § 96 (doc. 105, at 1). This Court has rendered two previous Opinions on this claim (doc. 64, 88) and narrowed the case down to the following issues:

1) Was the debtor insolvent within the meaning of the Bankruptcy Act (11 U.S.C. § 1(19)) at the time of the alleged preferential transfers;

2) Did the Bank have "reasonable cause" to believe the debtor was insolvent within the meaning of § 60(b);

3) The exact amount by which the Bank was unsecured (*see* doc. 88, at 10–11).

In our prior Opinion, we also indicated that we would entertain arguments on the issue of whether the Bank may exercise a right of set-off against the $268,000 in the debtor's general accounts as of the date of bankruptcy (doc. 88, at 11).

This Court received testimony on all of the above issues on September 27 and 28, 1978 and the parties have submitted extensive post-trial briefs on all issues (doc. 68, 92, 95, 99, 101, 104–07). The Court hereby makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ. Pro. 52.

I

INSOLVENCY

■ Before proceeding to our findings and conclusions concerning the "insolvency" of the "debtor," 11 U.S.C. §§ 1(19), 96, we must resolve a preliminary issue. At the September, 1978 trial, defendant raised for the first time whether it was proper to consider World and its subsidiaries on a consolidated basis for determining insolvency. Defendant contends that this Court must treat World as the sole "debtor" for the purposes of Section 60, 11 U.S.C. § 96, and Section 1(19), 11 U.S.C. § 1(19) (*see* doc. 104, at 3–4, 5–8; doc. 107, at 2). Reasoning from that position, defendant goes on to contend that by including certain intercompany accounts present between World and its subsidiaries (World Academy Schools for Foreign Study (WAS), Institute of Cultural Education (ICE), International School for Young Americans (ISYA), WACO Construction Co. and Travel Rite International Products (TRIP)), World Academy was not insolvent during the four month period in question (*see* doc. 104, at 4–6; doc. 107, at 2). This contention is opposed by plaintiff (doc. 105, at 9–11; doc. 106, at 1–5). The facts concerning this issue are as follows:

In November of 1969, the defendant Bank extended credit in the amount of $500,000 to the "World Academy group of corporations" (*i. e.*, World and its five wholly-owned subsidiaries) through execution of a letter of credit and a security agreement (DX 1–2; PX 2). In extending this credit, the Bank was relying on various financial statements concerning the bankrupt corporations, all of which were done on a consolidated basis (doc. 94, at 5–10; DX 6–A, 6–D. *See also* DX 6–C). Although the security agreement lists only World as the "borrower," both the agreement and the accompanying letter of credit were signed by representatives from all six companies (who in some cases were the same people), apparently "all as debtors" (*see* doc. 34, at 5–6). Financing statements were executed by all of the corporations and filed with the Secretary of the State of Ohio and Hamilton County Recorder (DX 30, 31).

On March 16, 1970, the maturity date on the $500,000 indebtedness was extended for 30 days, if the company and its subsidiaries would pay, on account of the principal due, $100,000 in April and $200,000 in cash of May and June (doc. 34, at 6). On March 31, the Bank and World "agreed" to the creation of the collateral account, the operation of which we have canvassed in our prior Opinions (*see* doc. 34, at 6–8; doc. 64, at 4–7; doc. 88, at 5–8). The evidence revealed that World and its subsidiaries were treated as a consolidated entity by the Bank during this period (doc. 88, at 5–8) (*see also* Thomas Depo. Ex. 13) (doc. 59, Cissell Aff., Ex. 6–7); (doc. 106 ¶ 2(f)). However, the payments of which the Trustee complains were made solely by World Academy, Inc., to the Bank (DX 15) (*but see* PX 5).

The evidence also reveals that throughout this entire litigation, all parties treated the bankrupt entities as a unit. In the July 14, 1970 entry in the bankruptcy proceedings, the various companies were treated as a group (DX 11). In their various filings in this case, all parties have treated the bankrupt entities as a consolidated unit (*see, e. g.*, doc. 2, at 2; doc. 34, at 5–10; doc. 44, at 4–5; doc. 55, at 6–7; doc. 60, at 10–15; doc.

64, at 2–7, 16–18; doc. 68, at 2; doc. 88, at 5–11). We have been unable to find any reference to a treatment of World as an entity distinct from its subsidiaries prior to defendant's presentation of this issue on September 27–28, 1978. And, as we mentioned above, World Academy and its subsidiaries were treated as a consolidated basis by all of the defendant's officers during the period in question—Loan Officer Thomas (doc. 93, at 9, 13–14, 16–17, 18–20, 34–35), Bank Manager Rielag (doc. 94, at 10, 12, 17–18, 33–34, 34) and Bank President Liggett (doc. 90, at 41–44, 52–53, 56) (*see also* PX 1, at 9–12, 15, 22).

Defendant, however, argues that unless an intention to defraud creditors appears, a bankruptcy court will not "pierce the corporate veil" to examine the substance of a transaction (*citing* 4 Remington on Bankruptcy § 1744.1 at 499 (1957)). That section deals with the issue of when a bankruptcy court, as a court of equity, should invalidate transfers between related corporations (in a proceeding against only one of them) as a conveyance fraudulent as against the creditors of the transferor/bankrupt corporation. The question we are presented with herein is whether this Court in this Section 60 proceeding should treat World Academy, Inc., and its subsidiaries, as a consolidated unit or as separate and distinct entities when bankruptcy petitions for all the corporations were filed in the same court at about the same time and were treated in a consolidated manner (*see* DX 11) (*see also* doc. 64, at 7–8). We find the following in 1 Remington on Bankruptcy §§ 262–63 (1950) concerning consolidation:

> Individual corporate entities have frequently been disregarded in equity for the purposes of convenience. Where the property or business of two or more insolvent corporations are so commingled that essentially but one problem of liquidating their affairs for the benefit of all concerned is presented, distinct proceedings are not required, or advantageous, and a consolidation is permissible. (1 Remington on Bankruptcy, § 263, at 403) (*see also* 4A Collier on Bankruptcy ¶ 70.15[2] n. 14, at 138 (1978)).

The leading case is *Stone v. Eacho,* 127 F.2d 284 (4th Cir. 1942). *See also* Annot., 51 A.L.R.2d 989, 998–99 (1957). That case concerned the related bankruptcies of Tip Top Tailors, Inc., a Virginia corporation and Tip Top Tailors, Inc., a Delaware corporation. The Delaware corporation was the parent and operated nine retail stores throughout the country. One of these stores was in Richmond, Virginia. Approximately six months after its incorporation, the Delaware corporation secured the incorporation of its Virginia outlet under the laws of Virginia. The Virginia corporation was a wholly-owned subsidiary of the Delaware corporation, had the same officers as the Delaware corporation and was dealt with by the Delaware corporation "precisely in the same way as it dealt with the other stores that it was operating, as to which there was no pretense of separate incorporation." 127 F.2d at 286. The two corporations/stores were thus essentially run from the same set of books with the Delaware corporation furnishing "start-up" funds and collecting net proceeds and charging the Virginia corporation for any expenses incident to the operation of the Richmond, Virginia store or its proportionate share of the parent corporation's office expenses. *See* 127 F.2d at 286–87. At the time of the dual bankruptcies, the Virginia corporation had charges on the books of the Delaware corporation in the net amount of approximately $39,000. The receiver for the Delaware corporation (which had previously filed for bankruptcy) filed a petition for involuntary bankruptcy against the Virginia corporation and subsequently filed a claim for the $39,000 owing by the Virginia corporation to the Delaware corporation. The trustee in bankruptcy for the Virginia corporation resisted this claim and asked that it be subordinated to the claims of the other creditors.

The issues were referred to a special master who found for the Virginia trustee on the basis that the Virginia corporation was a " 'mere agency or corporate pocket' " of the Delaware corporation. 127 F.2d at 287.

The Delaware receiver appealed to the District Court claiming error and "asking, as alternative relief, that the corporate entity of the Virginia corporation be entirely disregarded and that the bankruptcy proceedings [of the two corporations] be consolidated . . . to the end that all creditors . . . share *pari passu* in the distribution of the consolidated assets." 127 F.2d at 287. The District Court denied the motion and affirmed the report of the special master.

The Fourth Circuit reversed and remanded holding that the separate corporate entities should be ignored and the dual bankruptcy proceedings consolidated in order to provide "that equality of treatment [among all creditors of both corporations] which it is the purpose of the bankruptcy act to afford." 127 F.2d at 288. In the course of the Opinion, Circuit Judge Parker stated the following:

> We agree with the court below that, if the separate existence of the Virginia corporation is recognized, the claim of the Delaware corporation should be postponed to the claims of other creditors. It is too well settled to admit of argument that the claims of a parent corporation against a subsidiary should be thus postponed where the subsidiary, as here, has in reality no separate existence, is not adequately capitalized and constitutes a mere instrumentality of the parent corporation or a mere "corporate pocket" or department of its business. [Citations omitted.] And even in the case of the insolvency of both corporations there may be reason for recognizing the separate entity of the subsidiary and postponing the claim of the parent, where the subsidiary has been allowed to transact business as an independent corporation and credit has been extended to it as such on the faith of its ownership of the assets in its possession. Latty, Subsidiaries and Affiliated Corporations, *supra*, pp. 153–155.

> But in a case such as this, where both corporations are insolvent, where the business has been transacted by and the credit extended to the parent corporation, and where the subsidiary has no real existence whatever, there is no reason why the courts should not face the realities of the situation and ignore the subsidiary for all purposes, allowing the creditors of both corporations to share equally in the pooled assets. As said in Latty, *supra*: "Perhaps the fairest way of dealing with the situation when both the parent and the subsidiary corporations are insolvent is to let all the creditors of each share pro rata in the pooled assets of both. (127 F.2d at 288) (Emphasis added.) (*See also* 1 Remington on Bankruptcy § 263, at 404–05.)

We think this same reasoning should apply to the situation herein. All parties have treated World and its subsidiaries as a consolidated unit throughout. It was apparent from the testimony presented that World's method of operation was to treat its subsidiaries as simply divisions of a larger consolidated operation and not as separate and distinct entities (*see, e. g.*, Testimony of Mr. Jentelson, doc. 102, at 107–112 ("[h]ere you've got two . . . companies, ICE and ISYA, that they operated as though they were making a hundred percent profit because they took in the student revenues and they didn't pay out a nickel for program costs and they funneled all the money over to their parent company") (doc. 34, at 5–8) ). *See also Cissell v. American Home Assurance Co.* No. 7899 (S.D. Ohio 1974) slip. op. at 1, 3–7, *rev'd on other grounds*, 521 F.2d 790 (6th Cir. 1975).[1] In such a situation, we think the resurrection of World Academy, Inc., at this stage as an entity separate and distinct from its subsidiaries is entirely unwarranted. We reject the view that the subsidiaries were merely "guarantors" of the loan (*see* doc. 34, at 5). Our conclusion is not that an intention to

---

1. As Judge Hogan stated at the outset of his Opinion:

 Actually, what was known as World Academy was a composite of various subsidiary and affiliate corporations [and] . . . the going concern(s) paid no practical or legal attention to various corporate entities and the purposes thereof. . . . (slip. op. at 1).

defraud creditors was present in the operation of World and its subsidiaries—rather, we think simply that the insolvent corporations were "so commingled that but one problem of liquidating their affairs for the benefit of all concerned is presented." 1 Remington on Bankruptcy § 263, at 403. We refuse to shut our eyes to the realities of the situation presented herein and we conclude that World and its subsidiaries should properly be treated in a consolidated manner.

■■ Having disposed of the preliminary issue, we next turn to the issue of insolvency. Insolvency for the purposes of § 60, 11 U.S.C. § 96, is defined as follows:

A person shall be deemed insolvent within the provisions of this [Act] whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts [11 U.S.C. § 1(19) 3 Collier on Bankruptcy ¶ 60.30 (1977)].

Thus, insolvency under the Act is to be determined by application of the "balance sheet" test. 1 Collier on Bankruptcy ¶ 1.19, at 98 (14th ed. 1974). In applying this test, the "assets must be valued at what they were reasonably worth at [the time of the alleged preferential transfers], and not at what they turned out to be worth at some time later after bankruptcy intervened." 3 Collier on Bankruptcy ¶ 60.31, at 895 (14th ed. 1977). The burden of proof is on the Trustee to show insolvency at the time when the alleged preferential transfers were made and, although the courts have occasionally considered the subsequent history of the property as bearing on its valuation at the time of transfer, generally the facts that the debtor was subject to a voluntary or involuntary adjudication in bankruptcy has no conclusive bearing on the question. 3 Collier on Bankruptcy ¶ 60.30, at 893, ¶ 60.31, at 894–96. *See also* 1 Collier on Bankruptcy ¶ 1.19[3] (1974). All parties have agreed on March 31, 1970 as the "crit-ical date" for determining whether World Academy (consolidated) was insolvent (doc. 104, at 9).

■ Defendant asserts that, on that date, a principal asset of World Academy was amounts owed the parent company by its subsidiaries, which defendant refers to as "accounts receivable" (*see* doc. 104, at 4–6, 8–10) (DX 27). Relying on these "accounts receivable" assets, defendant contends that World Academy, Inc., was solvent. *Id.* These intercompany accounts would only exist as assets for valuation purposes were defendant successful in resurrecting World Academy as a separate and distinct entity from its subsidiaries. As we have ruled above, we do not think such treatment is either proper or equitable. *See* pp. 478–481 *supra.* Under generally accepted accounting principles, these inter-company accounts are eliminated when consolidated treatment is employed to avoid the error of double accounting and the premature recognition of income (doc. 102, at 200–02, 243–53) (*see also* doc. 102, at 72, 246–47) ("He included the same dollars twice . . ."). Thus, defendant's statement of assets in his proposed Findings of Fact and Conclusions of Law must be reduced by the amount of these "accounts receivable from subsidiaries" ($1,902,658) (*see* doc. 104, at 4) (DX 18). When this sum is subtracted from assets, World Academy was insolvent on March 31, 1970, with debts in excess of assets (doc. 104, at 4–5). Defendant has never disputed that, on a consolidated basis, World Academy was insolvent on March 31, 1970.

As we noted above, the proper test for insolvency is a "balance sheet" test. *See* p. 481 *supra.* Under defendant's theory outlined above, World Academy, Inc. (the parent) was owed $1,902,658 by the subsidiaries on March 31, 1970, as "accounts receivable" and the value of these on March 31, 1970 was at least $970,000 (representing the amounts of prepaid student tuitions for the summer 1970 program transferred by the subsidiaries to World within sixty days following March 31, 1970) (doc. 104, at 8); (DX 23, payments post 3/31/70) (DX 27,

line 3 "as adjusted") (doc. 102, at 127–38). Including this amount in assets, defendant contends that World was solvent on March 31, 1970 (DX 27). Even if we were to accept defendant's resurrection of World Academy, Inc., as a separate and distinct entity (which we don't), defendant's logic concerning the value of these "accounts receivable" is, we think, fallacious.

First, these so-called assets must be valued as of March 31, 1970, as we noted above. The evidence presented at trial showed that on February 24, 1970, defendant received statements of "Projected Operating Profit (Loss)" for World Academy (consolidated), as well as for each of the subsidiaries (PX 16). All corporations showed an estimated loss for the 1969–70 fiscal year with the total of $878,000 loss for the consolidated companies (PX 16, at 4–11). This figure was updated on March 23, 1970 to show a total deficit for the World Academy corporations of $1,134,000 (*see* PX 24; Carlson depo. Ex. 5); (*see also* doc. 88, at 7). In a previous Opinion we made the following findings concerning World's financial status, all of which the Bank was privy to:

> Documents showed that as of September, 1969, the net worth of World was $744,000. A cash flow report dated April 2 and 3 showed a projected cash flow April–September, 1970 that indicated a cash position for September 30, 1970 of negative $1,200,000 (Cd. 24–5). In a balance sheet for the period ending September 30, 1969, Peat, Marwick and Mitchell opined that the continuation of the business as a going concern was dependent on additional equity capital and future profitable operations. There were serious discussions between Carlson and Rielag about cash flow and timing of incoming revenues (Cd. 27). A May 4 document showed that the May 31 cash position was estimated to be $24,000. This was dangerously low according to Carlson, and he and Rielag probably discussed it (Cd. 36). At the end of April, it was estimated that the cash position would be $600,000. It turned out to be $400,000 (Cd. 36–7). According to Carlson, World was not meeting its payables in April and May, as they became due (Cd. 39), and Rielag must have known that from the list of aged payables he was given. As of March 31, $322,000 was due, $201,000 of which was 90 days old (Cd. 39–40), which was not normal trade practice (Cd. 40). Furthermore, Carlson's own deposition indicates that he was aware that World couldn't meet its current obligations (Cd. 38, 39) (doc. 88, at 6–7, *citing* Carlson deposition).

This evidence demonstrates that, on March 31, 1970, all the World Academy corporations, either considered as a consolidated unit or as separate entities, were broke. Thus, any amounts owed the parent from the subsidiaries was uncollectible. As assets, these purported "accounts receivable" were worthless (doc. 102, at 34).

Second, the Peat, Marwick, Mitchell auditors determined in their audit that as of September 30, 1969, $1,858,315 of the advances to subsidiaries were uncollectible (*see* doc. 46, Acc't # 116 "Allowance for Doubtful Accounts From Subsidiaries per PMM" which was derived from the audit which defendant received on March 23, 1970, DX 6–D) (*see also* DX 16, at 1; DX 27). Defendant's figure of $1,902,658, therefore, we think, must be reduced by this amount which leaves a net value for these advances of $44,343 as of March 31, 1970 (DX 27; doc. 102, at 60–61, 241–42). Applying this figure to defendant's calculation of World's financial status as of separate entity leaves an excess of debts over assets on March 31, 1970 of $261,526—with a total "equity (deficit)" of $450,287—a fact which defendant admits (*see* DX 27, "Per Jentelson Consolidating Trial Balance"; doc. 102, at 141–42). Thus, World Academy was insolvent on that date.

Finally, we emphatically reject the view that these inter-company advances and loans from World Academy, Inc., to its wholly-owned subsidiaries were accounts receivable. As we noted above, World's method of operation was to treat its subsidiaries as simply divisions of a larger consolidated operation. *See* pp. 478–479, 480 *supra.* The subsidiaries collected the

prepaid student tuition payments and routinely transferred those funds to the parent; some of the subsidiaries acted as conduits, operating as if they had no expenses and were making "a hundred percent profit." (doc. 34, at 5–8; doc. 102, at 109–112; *see also* Fish Depo. at 18–22; Carlson depo. at 21; Hyde depo. at 6–19, 79–82). Thus, the $970,000 transferred from the subsidiaries to the parent within 60 days after March 31, 1970 represented pre-paid tuitions which should have been applied to program costs for the coming summer 1970 program (doc. 102, at 108–09). Characterizing this sum as a payment on an "account receivable" (and thus, as defendant claims, the best test of the value of these inter-company accounts, doc. 104, at 9–10) ignores the fact that World was structured to pay the program costs for the European trips (doc. 102, at 100). The inter-company accounts did not represent a "right to payment for goods sold or leased or for services rendered" (O.R.C. § 1309.01(A)(10) and the $970,000 was not a payment on such an account.

Certified Public Accountant Jentelson testified at trial that, based on his examination of the books and records of World and its subsidiaries and applying generally accepted accounting principles, that World Academy (consolidated) and all the companies individually were insolvent on March 31, 1970 and at all times thereafter (doc. 102, at 13–35). We have examined the two financial statements submitted by Mr. Jentelson in support of his testimony (DX 19, 20).[2] Based upon our examination, we conclude that both of the consolidated balance sheets submitted by Mr. Jentelson present an accurate picture of the financial condition of World Academy (consolidated) as an ongoing business on March 31, 1970 and we hereby adopt them. Based upon those two documents (DX 19, 20) and all of the evidence presented above, we conclude that during the period in question, World Academy, Inc., was insolvent within the meaning of the Bankruptcy Act. 11 U.S.C. §§ 1(14)(19), 60.

## II

## BANK'S KNOWLEDGE OF INSOLVENCY

At this point we incorporate the previous findings of fact set out in our prior Opinions insofar as they are relevant to the issues presented herein (doc. 64, 88). Sec-

---

2. One of the problems evident throughout this case has been the accounting treatment of the pre-paid student tuitions. This was encountered by both parties, as well as by the Court (*see* doc. 102, at 90–102, 124–132; doc. 64, at 8–14; doc. 88, at 8–10). Mr. Jentelson dealt with this problem by using two methods of accounting. The first, utilized in DX 19, was the deferred revenue method. Under this method, the pre-paid tuitions are included as a liability (akin to a "contract right") *to* be discharged in the future as the services are rendered (DX 19, note 4) (doc. 102, at 30). Since Mr. Jentelson prefers the second method (in spite of the fact that World used the first, doc. 102, at 18), he refers to the first method as his "alternative method" (doc. 102, at 20). The second accounting method, which Mr. Jentelson considers "more fair and equitable," (doc. 102, at 20) was the "cause and effect" method (DX 20, note 4). Under this method, the advance tuition payments are taken into income and a figure representing accrued and unpaid program costs for the 1970 program as of March 31, 1970 is charged off on the liability side of the balance sheet. In the language of Mr. Jentelson,

Taking the deferred revenue into income was the cause. The effect was having . . . accrued and unpaid pro rata 1970 program cost, again treating this as a going business at March 31, 1970. [I had to] compute what the program cost would have been had the programs all been completed all through this June, July and August, and maybe up to Labor Day of 1970. Then I had to compute the total billing for the entire year. Then I had to arrive at a percentage of the billing up through March 31 as related to the total billing, and apply that same percentage to the total program cost and arrive at a pro rata program cost and pare it up to March 31, and subtract from that the five hundred odd thousand dollars that they had paid [by that time.]

Anyway, on this cause and effect method . . . the liabilities exceed the assets by $956,000 . . . (doc. 102, at 32–33).

Either method we think represents a fair valuation of the assets and debts of World Academy (consolidated). 11 U.S.C. §§ 1(14)(19), 60.

tion 60b of the Bankruptcy Act provides as follows:

> Any such preference [under section 60a] may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time the transfer is made, reasonable cause to believe that the debtor is insolvent.

This provision has been interpreted by Collier to mean that:

> Knowledge of insolvency is not necessary, nor even actual belief thereof; all that is required is a reasonable cause to believe that the debtor was insolvent at the time of the preferential transfer. A creditor has reasonable cause to believe that a debtor is insolvent when such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lend a prudent business person to the conclusion that the debtor is insolvent. Of course, a creditor may not willfully close his eyes that he might remain in ignorance of his debtor's condition. On the contrary, where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed. In such a case, an inquiry of the debtor alone is generally insufficient, where his answer, under the circumstances, could readily have been found to be untrue. As a matter of fact, it is the creditor's cause for belief and not the debtor's knowledge, or lack of it, that is important. And if a creditor fails to make an inquiry when he has a duty to do so, he will be charged with all the knowledge that he would have acquired had he conducted such an investigation (3 Collier on Bankruptcy (Part 2) ¶ 60.53[1] (1977) (footnotes omitted). (*See also In re Hygrade Envelope Corp.,* 366 F.2d 584, 586–90 (2d Cir. 1966) (Friendly, J.)).

The facts concerning whether the Bank had reasonable cause to believe World Academy insolvent during the period in question are as stated below:

In November of 1969 when the Bank extended the $500,000 line of credit to World, one of the conditions for that credit was that the "Company . . . permit an officer of The First National Bank to attend Board Meetings as an observer without compensation and [that the Company] send proper notices of said meetings" (PX 2, ¶ 6). The officer chosen for this duty was L. Edward Thomas, who at the time was a loan officer at the Bank and the primary account officer for the World Academy accounts. The record demonstrates that Thomas attended almost all of the World Board meetings (PX 3–16). At trial, Thomas stated that his function was strictly as an "observer":

> I observed the conversations that were taking place. I made notes of the transactions that were occurring throughout the Board meetings and wrote these up and presented them back to the bank for review by my superior (doc. 93, at 8).

This role as Bank observer was confirmed by Bank President Liggett in deposition testimony (Liggett depo. at 27–28, 30, 42, 43, 47; doc. 103, at 25). As we noted above, the Bank in making the loan relied on certain consolidated financial statements, the most recent of which were the Mary Hall unaudited statements that showed a net worth of approximately two and a half million dollars with a net income (loss) for the previous nine months of just over a million dollars (DX 6–A, 6–C) (*see also* PX 3). Mr. Thomas testified at trial that he never saw World Academy operating at a profit (doc. 93, at 60). At a World Academy Executive Committee Meeting of February 3, 1970 (Mr. Thomas in attendance) it was reported that there would be "a possible loss of between $400–600,000" for the coming year (PX 13, at 2). At an Executive Committee meeting of February 10, 1970 (with Mr. Thomas in attendance), this figure was finally estimated as an "operating loss" of $877,500 (PX 16). At that time, it was also estimated that "our cash flow and equity needs are between 1.5–2 million" and that this would be needed by July, 1970 (PX 16, at 2). On March 2, 1970, Thomas at-

tended a Director's Meeting at which the revised student enrollment forecast was reported as 5300, which was down from 15,000 (PX 6, at 1). At trial, Thomas testified that in early March the "cash flow projections [were] on a downward trend, as were the projections for the student enrollment" (doc. 93, at 20).

During this period, World had been furnishing the Bank (in accordance with the terms of the letter of credit) with projections of cash flow (DX 24 "Statements"). A cash flow report dated on March 23, 1970 showed a projected cash flow February 1970 through January 1971 of a negative $1,400,000, while a later report dated April 2 and 3 showed a projected cash flow April to September 1970 of a negative $1,200,000 (PX 24; doc. 88, at 6; Carlson depo. 24–25). On March 23, 1970, Mr. Thomas received the Peat, Marwick, Mitchell audited, consolidated financial statement of World Academy (doc. 93, at 33–35) (PX 17; DX 6–D). This statement revealed that, as *of September 30, 1969,* World Academy had a "net loss" of $1,354,982 with a "deficit at end of year" of $1,542,512 (PX 17, at 2, 3; DX 6–D; doc. 103, at 19). The statement also revealed that "current assets were just slightly less than twice the current liabilities" (in the words of Bank President Liggett) and that the shareholders' equity (as of September 30, 1969) was only $745,000 (PX 17; doc. 103, at 19). In contrast to the unaudited Mary Hall statements of the previous September, "the net worth had shrunk from somewhere around two and a half million dollars down to this . . . $745,000 (doc. 103, at 19). Finally, Peat, Marwick, Mitchell indicated that although its financial statement had been prepared "in conformity with generally accepted accounting principles applicable to a going concern," the "continuation [of World] in that capacity is dependent upon obtaining additional equity capital and future profitable operations" (PX 17, at 1). Applying these Peat, Marwick, Mitchell figures to the projections received by the Bank from World during the previous five months, "the net worth projection at the end of September would have been approximately a negative worth of around $400,000" (Carlson depo., at 31–32). In Carlson's view, nothing occurred between his preparation, in March, of the April to September, 1970 cash flow and the date of bankruptcy to "brighten that picture"—"The only thing that happened was things that would have tended to make the retained loss or negative net worth larger" (Carlson depo., at 31–32).

Bank Manager Harvey Rielag was the supervising executive in charge of the Bank's relations with World Academy. On March 16, 1970, Rielag and Thomas met with Pulley and Fish concerning renewal of the Bank loan. It was disclosed then that student enrollments were 2000 behind the target figure and receipts were $170,000 behind that "required to meet priority payables" (PX 1, at 19). On March 23, 1970, Rielag learned of the Peat, Marwick, Mitchell statement and of the qualification contained in their letter of transmittal (doc. 94, at 28). At that time he had not been advised that any new equity capital would be forthcoming (doc. 94, at 29). He also was aware then of the shrinkage of net worth (as of the previous September) of $2,500,000 down to $745,000, the unfavorable cash flow projections, the downward trend of student enrollment projections and the firing of Jerry Pulley as President of World (the Bank had "an extreme amount of confidence" in Pulley according to Fish) (doc. 94, at 31–33; Fish depo. at 40–44; Hyde depo. at 60–61) (on this issue, *see also* our prior findings and conclusion, doc. 88, at 6–8). With this "change in management," Rielag testified that "he had an insecure feeling" about the Bank loan (doc. 94, at 32). At this point, Rielag called a meeting of Hyde (then President of World), Carlson (Comptroller of World), Blotter (Office Manager of World) with the head of the Bank's bookkeeping department (Joe Cleves) (doc. 90, at 3). The meeting occurred on March 31 and involved the creation of the collateral account.

At the meeting, Rielag exhibited concern over the financial status of World (even though the loan was not yet in default) and

informed the personnel from World that the Bank was going to consolidate all the World accounts into a "collateral accounts receivable account" leaving only enough for outstanding checks in the various corporate accounts (doc. 94, at 33–34) (Carlson depo. at 15–21). This collateral account would be controlled by the Bank and any future deposits would be placed in it rather than World's regular accounts (doc. 94, at 33–34). In Rielag's own words, the Bank in effect "blocked the account[s]" (doc. 94, at 34) (*see also* doc. 90, at 3–4; doc. 88, at 5–9) (Rielag depo., at 29–30). At the same time, Rielag (according to Carlson) "asked that we pay him the hundred thousand dollars at that time and . . . he expected an additional $200,000 payment approximately the 1st of May and another payment of $200,000 sometime in the future, probably around June 1" (Carlson depo., at 15–15). The payments on the loan were eventually made in that manner and the excess funds left over in the collateral account ($60,531.60) put back into World's general accounts (doc. 88, at 8). According to Blotter, "the meeting was pretty much a monologue" and "Mr. Rielag was instructing us really as to what the Bank was going to require of us"—"he closed the meeting by cautioning us not to surprise the Bank in any way, that we were to keep them advised immediately, even if the news were bad" (doc. 90, at 4). Finally, on the 30th of April, 1970, Rielag confirmed in an internal Bank memorandum to President Liggett the understanding he had conveyed to the World personnel concerning the status of their accounts:

> The Company bank balance is approximately $450,000 at this time. I told Budge [Hyde] to forward a check on the first of May for $200,000 to apply to their indebtedness, which reduces balance to $200,000 and I stated that the remaining $200,000 could be outstanding until June, but that the Bank balance in the collateral account at no time must be lower than $200,000, *i. e.,* our note is on demand and we will be in a position to off-set at any time we desire (PX 1, at 22, 25. *See also* Carlson depo., at 17).

In short, "it appears from the evidence that the Bank was . . . doing just what the Trustee contends it was doing—stepping in and controlling the debtor's cash in order to secure repayment of its extended loan" (doc. 88, at 10). (*See also* PX 24, "Credit Memos, at 20; PX 1, at 20).

Defendant claims, however, that on March 31, 1970, it could reasonably rely on World Academy's ability to secure additional equity capital from outside investors to meet its obligations (doc. 104, at 11–12; doc. 103, at 20). Specifically, defendant points to two documents. The first (DX 13–A) is a letter dated April 2, 1970 from Hyde to Rielag headed "Personal & Confidential" and listing investors that World planned to visit "in the next several days." "All," it states, "have been contacted with regard to our financial position prior to this time" (DX 13–A, at 1). The second (DX 14, 34) is a note written by Thomas dated April 13, 1970, concerning a phone call made by a "Trust Investment Officer" for Northwestern National Bank) (one of the investors listed on DX 13–A) to the Bank inquiring about World Academy. As we translate the note, it reads as follows:

> Feels Co. will be taken care of til end of current program year but there is much discussion about future[.] [W]ill have to come to decision in next few days.

> Was complimentary about our Bank control and thought as result we should get out OK

LET

(DX 14, 34).

First, as we noted above, Rielag testified at trial that he had not been advised of any forthcoming equity capital at the time the Bank created the collateral account (doc. 94, at 29). Second, through Ed Thomas, the Bank had received a copy of a February 26, 1970 letter from Pulley at World to Jack Schutte, Trust Investment Officer for Northwestern National Bank (PX 24, "Correspondence," at 20). In that letter, World disclosed its financial position to the potential investors, to-wit: (i) a projected operat-

ing loss of $878,000 for fiscal 1969–1970; (ii) the estimated $457,000 gain on an estimated 1970–71 Profit and Loss statement was due to a "tax loss carry forward"; (iii) World Academy was in immediate need of additional equity capital with a "peak need of about $1.5 MM by November, 1970; and (iv) future profitable operations depended upon increased enrollment and reduced operating expenses (PX 24, "Correspondence," at 20–21). Finally, Schutte, on deposition, indicated that, in mid-December, he had met with Thomas and that they had agreed then that "the company had no moneys to speak of" (Schutte depo., at 63). At that time, Thomas had indicated that, although the Bank was "nervous" and "deeply concerned about the recoverability of its loan position," they would be willing to work and "try and see things through" if the company would "get its financial affairs in order, to put some controls on its spending, reduce its overhead" and "find some additional financing" (Schutte depo., at 62–63, 72, 76). Schutte's "distinct impression" in mid-December after talking with Thomas was that "unless the company took steps to show the Bank that it was going to be able to operate on a more business-like basis and conduct its affairs in a more business-like manner, the Bank was not going to string along with the company for a significant length of time" (Schutte depo., at 71–72). By early April, however, when the loan payments had started, Schutte concluded "that the Bank was embarked on a program of getting its loan paid off as quickly as the company's funds would permit it to be done" (Schutte depo., at 107). In light of the financial data furnished to the proposed "investors" and the circumstances surrounding the establishment of the collateral account and the payments schedule on the Bank loan, our conclusion is that the Bank in March, 1970 could not and was not, in fact, reasonably relying on the ability of

World to attract additional financing. The implication, if any, which we draw from defendant's two exhibits (DX 13–A, 34) is that, even though World may have been seeking additional financing in April, the Bank was doubtful of the success of such an effort and had already taken steps to "control" the debtor's cash in order to "get out O.K.," as soon as possible (DX 14, 34) (doc. 88, at 10). (See also PX 24, "Credit Memos," at 22).[3]

Plaintiff, in support of his arguments concerning the inability of World to obtain additional financing, points to various other statements of Schutte and other investors, concerning World's financial status (doc. 105, at 4–5; doc. 106, at 8–9). Although Schutte during this period had numerous contacts with a partner in a law firm which routinely represents the Bank (Schutte depo., at 21, 41, 48–51, 76–77), we choose not to rely on any of these other statements because there is no evidence that they were ever actually transmitted to the Bank (doc. 103, at 47–48).

In light of the financial information concerning World Academy enumerated above which was available to the Bank as of March 31, 1970 and the actions which the Bank took based on that information, this Court cannot help but conclude that on that date the Bank had "reasonable cause to believe that the debtor [was] insolvent" within the meaning of Section 60, 11 U.S.C. § 96b. This case differs drastically from Mack v. Bank of Lansing, 396 F.Supp. 935 (W.D.Mich.1975) (Rubin, J.) cited to us by defendants. In that case, Judge Rubin noted that all normal lines of inquiry for the creditor in that case "indicate[d] substantially more assets than liabilities, [and] also an improving business picture." 396 F.Supp. at 942. The bank in that case did not have a bank official acting as observer at Executive Committee and Board meet-

---

**3.** Interestingly enough, when a proposal for additional financing was finally made in late April, 1970, the institutional investors, represented by Mr. Schutte, insisted on "controls" of their own, to-wit: (1) the outstanding 1,500,000 shares should be reduced by having stockholders (including Hyde and Fish) turn in 800,000 shares, leaving the Northwestern group with 30% of the outstanding stock; (2) a new Board of Directors under the direction of the Northwestern group; (3) Merlin Fish to resign as a director and officer; (4) Budge Hyde to continue in the operation of the business under contract (see PX 1, at 21; DX 13–B).

ings and the most recent audited financial statement of the debtor indicated a net worth of $12,500,000. 396 F.Supp. at 938. "A most careful review of the evidence," stated Judge Rubin, "reveals that no facts which would have suggested insolvency were brought to the defendants' attention prior to or at the time of the transfer." 396 F.Supp. at 942. By contrast, the Bank here had, in late March, information showing: (1) a precipitous drop in net worth as of September 30, 1969 from Mary Hall's estimate of two and a half million dollars to the Peat, Marwick, Mitchell audited figure of $745,000; (2) an estimated operating loss for fiscal 1969–70 of $878,000; (3) recurring negative cash flow figures "on a downward trend"; (4) that World had had an end of year deficit of the previous years of $1,542,-512; (5) the downward trend of student enrollment projections; (6) that World would need additional equity capital to keep going and there was no immediate source of financing available. In light of this information, as well as the other facts enumerated in our findings above, we think that the Bank had reasonable cause to believe on March 31, 1970 that World Academy, Inc., and its subsidiaries, either considered together or separately, were insolvent. *Mack v. Bank of Lansing*, 396 F.Supp. at 942–43; 3 Collier on Bankruptcy (Part 2) ¶ 60.53[1] (1977).

## III

### AMOUNT OF THE BANK'S SECURITY

This issue has proved to be the most difficult and confusing aspect of this case, especially because of the Bank's position both as a creditor of World and a repository for World's funds. For the reasons stated below, we have concluded that the Bank's interest in all funds in controversy was unsecured and unperfected at all relevant times and inferior to the claim of the Trustee in Bankruptcy. 11 U.S.C. § 96.

The starting point for our analysis is our prior holding that the Bank was unsecured and unperfected in bankruptcy as to the pre-paid student tuitions because these were "contract rights" and the Bank had only listed "accounts receivable" in its financing statement (doc. 88, at 8–9; doc. 64, at 8–14). Our analysis was based on the distinction drawn in the 1962 U.C.C. (which is the applicable Ohio law) between "contract rights" and "accounts receivable." Under the Ohio U.C.C., a "right to payment for . . . services *rendered* which is not evidenced by an instrument or chattel paper" is an "account receivable" whereas a "right to payment under a contract *not yet earned by performance* and not evidenced by an instrument or chattel paper" is a "contract right." *See* O.R.C. §§ 1309.-01(A)(10), (11) (emphasis added). Since the pre-paid tuitions (for the summer 1970 program) had generally "not yet [been] earned by performance," we concluded that the Bank was both unsecured and unperfected as to this collateral because it had mislabeled the collateral in its financing statement. *See* O.R.C. §§ 1309.14–1309.15; J. White & R. Summers, Uniform Commercial Code § 23–16, at 843–44 (1972) (docs. 88, 64).

An "account receivable," however, is a proceed of a "contract right" once "the right to payment is earned under [the] contract right." O.R.C. § 1309.25(A). A necessary corollary to our holding above, therefore, was that "with performance the contract rights ripened into accounts" to which the Bank's security interests attached and perfected at the same time (*see* doc. 88, at 9; doc. 64, at 14); O.R.C. § 1309.15(A), (B)(4) (a debtor has no rights and therefore a security interest cannot attach "in an account until it comes into existence"). Seizing on some dicta in one of our prior Opinions (doc. 64, at 14), defendant argues that it was secured as to all amounts which had been earned by "partial performance" as of the dates of the payments by World to the Bank out of the collateral account (doc. 104, at 16–17, 19). In the alternative, the Bank argues that the "accounts receivable" in which it had a perfected security interest were the intercompany accounts owed by the subsidiaries to World (doc. 104, at 16, 18–19). We reject both arguments.

■ First, as to the intercompany accounts, we adopt our conclusions set out

above. *See* pp. 481, 481–482, 482–483. These intercompany advances and loans were not "accounts receivable" within O.R.C. § 1309.01(A)(10). In addition, these purported "accounts receivable" had no value during the period in question and, in any case, should be eliminated when World is treated, as it was by defendant at all material times, as a consolidated entity. Hence, we reject the notion that the Bank had a perfected security interest in these intercompany loans and advances or that the payment to the Bank out of the collateral account (fattened by transfers to World from its subsidiaries) were payments on such a security interest.

Second, as to ripening of the "contract rights" into "accounts receivable" through performance, we think our analysis will be clarified by separating the time period in question into two parts—the first being that period prior to the running of the statutory four months under § 60 (*i. e.,* prior to March 7, 1970) and the second being the four month period itself. 11 U.S.C. § 96. Although the authorities are unclear whether "part performance" will be sufficient to ripen the "contract rights" into "accounts receivable,"[4] we have concluded that it makes no difference in any case. Even if part performance is sufficient, we hold that the Bank was unsecured as to the pre-paid tuitions at all material times.

■ Turning first to the "pre-four month period" (*i. e.,* prior to May 7, 1970), it appears logical that, if the "part performance" argument of the Bank is accepted, then to the extent World spent money for program costs for the summer 1970 student trips prior to March 7, 1970, then by the same proportion it "earned" the "contract rights."[5] (*See* doc. 104, at 16–17.) Once "earned," the "contract rights" ripened into "accounts receivable." O.R.C. § 1309.23(A). In this case, however, we are dealing with *pre-paid* student tuitions. An "account receivable" is a "*right to payment* for . . . services rendered . . . *.*" O.R.C. § 1309.01(A)(10) (emphasis added). Hence, at the point the contract rights ripened into accounts receivable, the accounts receivable then vanished (since the "account" had been paid) and the resultant funds were "cash proceeds." O.R.C. § 1309.25(A). To determine whether the Bank held a perfected security interest in these funds, we must therefore turn to the proceeds section of the Code. U.C.C. §§ 9–306; O.R.C. § 1309.25.

■ The Bank's financing statements establish that it secured an interest in "all accounts receivable now owned or hereafter acquired by debtor"; although the financing statement contained a box which would show that the "proceeds of collateral are also covered," defendant did not check this box (PX 27–32). This, we think, was defendant's fatal error. *See* J. White & R. Summers, Uniform Commercial Code § 23–9, at 813 (1972). The Commercial Code recognizes that a creditor may perfect an interest in collateral but fail to secure and perfect an interest in the proceeds. In order to accommodate the legitimate interests of such a creditor, the Code provides him with a ten-day "grace period" within which

---

4. The parties have cited us no authority on this point other than the dicta in our prior Opinion (doc. 64, at 14). Since the word "performance" is nowhere defined in the Code, presumably it retains its common law definition. O.R.C. § 1301.03. Under the common law, part performance of an entire and indivisible contract (in this case, the student service contracts for European trips) is insufficient to support recovery of damages, although this rule "has not always been adhered to by equity courts when equitable circumstances intervened." 17 Am. Jur.2d Contracts §§ 379, at 823, 380, 383 (1964); 11 O.Jur.2d Contracts §§ 233–37 (1955). (With regard to sales as opposed to service contracts, *see* U.C.C. § 2–607, O.R.C. § 1302.65(A), Comment 1). Since we have concluded that it makes no difference in any case, it is not necessary for us to decide the question.

5. This, of course, begs the question of whether World could "earn" these "contract rights" merely by spending money on the students' behalf—when, in fact, in many cases, the student recipients received very little of the expected performance. *See* Cissell v. American Home Assurance Co., No. 7899 (S.D.Ohio 1974) slip. op. at 3, 16–19, *rev'd on other grounds,* 521 F.2d 790 (6th Cir. 1975). Since we have concluded that it makes no difference in any case, we need not answer the question. *See also* note 4 *supra.*

to act. U.C.C. § 9–306(3). This provision in Ohio law reads as follows:

> The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless:
>
> > (1) a filed financing statement covering the original collateral also covers proceeds; or
> >
> > (2) the security interest in the proceeds is perfected before the expiration of the ten day period (O.R.C. § 1309.-25(C)).

When the "contract rights" ripened into "accounts receivable" by performance outside the four-month period, defendant's interest in the accounts immediately became secured and perfected. Since we are dealing with the "cash proceeds" of the "accounts," however, and defendant failed to cover proceeds in his original financing statement, defendant must bring himself within the savings exception of § 1309.-25(C)(2) in order to continue in his secured perfected status beyond the ten day "grace period." The courts and commentators who have considered this provision have concluded that the creditor must perfect his interest in proceeds *within the ten day period* in order to continue his status. *Appliance Buyers Credit Corp. v. Stikes*, 18 U.C.C.Rep. Serv. 576 (S.D.Ala.1975); *In re Platt*, 257 F.Supp. 478 (E.D.Pa.1966); *Barth Bros. v. Billings*, 68 Wis.2d 80, 227 N.W.2d 673 (1975); *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967); J. White & R. Summers, *supra*, § 23–9, at 813. This interpretation is also supported by the official comment to this section:

> (b) Divisions (B) and (C) make clear that the four-month period for calculating a voidable preference in bankruptcy

begins with the date of the secured party's obtaining the security interest in the original collateral and not with the date of his obtaining control of the proceeds. The interest in the proceeds "continues" as a perfected interest if the original interest was perfected; but the interest ceases to be perfected after the expiration of ten days unless the financing statement covering the original collateral covered the proceeds or unless the secured party perfects his interest in the proceeds themselves—*i. e.*, by filing a financing statement covering them or by taking possession. (O.R.C. § 1309.25, Official Comment 2(b)).

The Bank, however, points to this comment and argues that, since under Ohio law a bank "owns the monies deposited with it" and the relationship of the bank and depositor of a general deposit is "merely one of creditor/debtor," [6] it took "possession" within the meaning of this comment and § 1309.25(C)(2) when the monies were deposited with it in World's bank accounts. We think this reasoning is faulty for several reasons.[7]

▮▮▮▮ First, "possession" within the meaning of Comment 2(b) to O.R.C. § 1309.-25, we think, means that degree of possession *necessary to perfect one's interest* within the meaning of the Code. O.R.C. § 1309.25(C)(2) (The security interest in proceeds continues after the ten-day period if "the security interest in proceeds is *perfected* before the expiration of the ten day period") (emphasis added). Under the U.C.C., a security interest may be perfected by possession (akin to the common law "pledge") as provided in § 9–305 (O.R.C. § 1309.24). This section and the comments following it permit "a security interest to be perfected by a transfer of possession *only* when the collateral is goods, instruments, documents, or chattel paper: . .

---

6. *See* doc. 107, at 3; *Speroff v. Trust Co.*, 149 Ohio St. 415, 417, 79 N.E.2d 119 (1948); *Union Properties, Inc. v. Baldwin Bros.*, 141 Ohio St. 303, 310–11, 47 N.E.2d 983 (1943); *Bank of Marysville v. Windisch-Muhlhauser Brewing Co.*, 50 Ohio St. 151, 157, 33 N.E. 1054 (1893).

*See also* 7 O.Jur.2d Banks §§ 130–31 (rev.ed. 1969).

7. We note that we are dealing here with the World bank accounts as they existed prior to the creation of the collateral account on March 31, 1970.

accounts, contract rights and general intangibles are excluded." O.R.C. § 1309.24, Comment 1 (emphasis added). The U.C.C. definition of goods excludes money, O.R.C. § 1309.01(A)(6), and courts have observed that, under the U.C.C., money is generally a medium of exchange and not a good, instrument, document or chattel paper. *Cf. In re Midas Coin Co.*, 264 F.Supp. 193, 195, 197 (E.D.Mo.1967), *aff'd sub nom. Zuke v. St. John's Community Bank*, 387 F.2d 118 (8th Cir. 1968) (United States coins with appreciable numismatic value which were used in bankrupt coin dealer's business were a "good" within the U.C.C. and hence could be pledged pursuant to 9–305). Hence, the Bank's purported "possession" of these proceeds in the World bank accounts was not sufficient, we think, to continue the Bank's perfected status beyond the ten-day period allowed under O.R.C. § 1309.25(C).[8]

■ Second, the term "possession" is not defined in the Code—we are left with "several hundred years of cases and . . the policy of Article Nine" to define the term. *See* O.R.C. § 1301.03; J. White & R. Summers, *supra* § 23–10, at 816. Under Ohio law, the term "possession" envisions a complete transfer to the creditor such that the debtor "has done all that he can do . . and has given such possession to the pledgee or transferee as the nature of the property and its situation will permit." *Dale v. Pattison*, 234 U.S. 399, 410, 34 S.Ct. 785, 789, 58 L.Ed. 1370 (1914) (Ohio law); 68 Am.Jur.2d Secured Transactions § 73, at 903 ("The pledgee's possession, to be effective, had to be complete, unequivocal and exclusive of the pledgor's possession in his own right"). In the period prior to March

7, 1970, the debtor's accounts with the Bank were general accounts in which the debtor deposited the pre-paid tuitions (as well as other receipts from operation of its business) and from which the debtor freely withdrew monies for payments to third parties. These accounts were not security deposits. Hence, we conclude that the Bank's "possession" of these funds was not sufficient for the purposes of continuing its perfected status under § 1309.25(C)(2).[9] The Bank's status as a perfected secured creditor of any proceeds of "contract rights" earned prior to March 7, 1970 (and thus perfected "accounts receivable" prior to that date) expired at the latest on March 17, 1970. O.R.C. § 1309.25(C). The payments to the Bank were made on March 13, 1970, April 13, 1970, May 1, 1970, and May 8, 1970. As to those payments made after March 17, 1970 (*i. e.*, payments # # 2, 3, 4), we think the Bank's security interest in the pre-March 7 accrued "accounts receivable" had become unperfected by the failure of the Bank to properly perfect an interest in proceeds and the expiration of the ten-day "grace period." O.R.C. § 1309.25(C)(2).

The March 13 payment presents another problem. Assuming (as we have) that World was continuously "earning" the "contract rights" and the Bank was therefore securing and perfecting its interest in "accounts receivable" during this period, then presumably some of those accounts were "earned" in the ten days preceding March 13 (although there was no proof presented on this point at trial). To the extent those accounts were "earned" prior to the commencement of the four month period (*i. e.*, between March 3, and March

---

8. This is in accord with the general view that one cannot perfect a security interest in a bank account. *See* U.C.C. § 9–104(k); O.R.C. § 1309.04(J); 48 O.Jur.2d Secured Transactions § 15, at 259 n.1 (1966).

9. Since the proceeds of the Bank's security were commingled with other funds (i. e. the pre-paid tuitions which had not yet been "earned") as to which the Bank was unsecured and unperfected, it is arguable that the Bank's interest is limited by U.C.C. § 9–306(4)(d) which "purports" to give the secured creditor

an interest in non-identifiable proceeds commingled in a bank account. O.R.C. § 1309.-25(D)(4); J. White & R. Summers, *supra*, § 24–6, at 886–888. The parties, however, did not raise this issue and no evidence was presented on it at trial. We therefore choose not to deal with it although we note that the Bank, under our holding below, does have the right of set-off which is included in subsection (D)(4)(a) of that Code section. *See* pp. 494–495 *infra*.

7),[10] a payment to the Bank out of the "cash proceeds" of its secured and perfected interest in these accounts would be invulnerable to the Trustee's Section 60 attack. 11 U.S.C. § 96; O.R.C. § 1309.25(C)(2). We think, however, that this March 13 payment is voidable in any case.

 Aside from the limited exception provided in U.C.C. 9–306(4)(d) for non-identifiable proceeds received by the debtor within the ten days preceding bankruptcy, the Uniform Commercial Code generally continues the pre-Code rule that a creditor must identify the funds as proceeds of his original collateral before he could prevail over the trustee. *See* O.R.C. § 1309.25, Comment 2(a) ("the secured party, if he could trace the proceeds could reclaim them or their equivalent from . . . the trustee in bankruptcy"); J. White & R. Summers, *supra*, § 24–6, at 884–86. Although there were two payments to World totaling $50,000 from its subsidiaries on or prior to March 13, 1970 (DX 23), there was no showing that the $4090 paid to the Bank on that date were out of these funds (which we shall assume represent pre-paid tuitions, some of which were "earned" by partial performance prior to March 7) or were out of other funds already present in the World Academy, Inc., general account (doc. 102, at 203; doc. 105, at 18–19). Since defendant has not been able to identify this payment as coming from the proceeds of its secured and perfected security interest in "accounts receivable," we conclude that the Bank's claim on these funds based on its security interest in the pre-March 7 accrued "accounts receivable" is inferior to that of the Trustee. O.R.C. § 1309.25(B)(D)(1)–(3) (the security interest continues only in "identifiable" proceeds).

 Having disposed of the Bank's claim to these funds based on its perfected security interest in "accounts receivable" which accrued prior to the four-month period, we next turn to any claim the Bank may have based on "accounts receivable" which

accrued within the four-month period. As we noted above, the Bank was unsecured and unperfected as to the student pre-paid "contract rights" until they ripened into "accounts receivable" with performance, at which point the Bank's security interest attached and perfected. *See* pp. 488–489 *supra*; O.R.C. §§ 1309.14–15; doc. 88, at 9; doc. 64, at 14. Section 60a(2) of the Bankruptcy Act, however, provides as follows:

> For the purposes of subdivisions (a) and (b) of this section, a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee (11 U.S.C. § 96a(2)) (*see also* 11 U.S.C. § 1(30), last phrase).

In our view, the "antecedent debt" was created at the time the Bank extended the $500,000 loan to World and its subsidiaries in November of 1969. *See* p. 488, *supra*; 3 Collier on Bankruptcy (Part 2) ¶ 60.-39[4] (1977). To the extent therefore that the contract rights ripened into accounts receivable with performance within the four-month period, the Bank was securing and perfecting a security interest on collateral for an antecedent debt. Thus, we conclude that even assuming (1) the Bank had a perfected security interest in accounts receivable which ripened within the four-month period by "part performance" and (2) the Bank was paid out of the proceeds of such accounts, the Bank's security interest in these accounts was voidable under Section 60 by the Trustee because *the mere act of perfection was a transfer within the meaning of Section 60a(2), 11 U.S.C. § 96a(2).* Cf. *Glessner v. Massey-Ferguson, Inc.,* 353 F.2d 986, 990–93 (9th Cir. 1965); 1 Collier on Bankruptcy ¶ 1.30 (1978); 3 Collier on Bankruptcy (Part 2) ¶¶ 60.07, 60.-38–.39, 60.48 (1977); J. White & R. Summers, *supra*, § 24–4, at 871–72. As the

---

**10.** As for those accounts which were earned after the commencement of the four-month period, see our analysis below.

accounts came into existence by performance and the Bank's perfected security interest attached to them, the debtor (World) was deemed to have suffered "a transfer . . . of any of [its] property . . . to or for the benefit of a creditor for or on account of an antecedent debt . . . ." 11 U.S.C. § 96a(1)(2). Hence, the mere act of perfection by the Bank as to these accounts within the four-month period was preferential and voidable by the Trustee in any case. 11 U.S.C. § 96.

■ Assuming the above analysis is inapplicable to the accounts which accrued within the four-month period, we still think the Trustee would prevail over the Bank as to the four payments made by World to the Bank. As we noted above in connection with the March 13, payment of $4090, the Code continues the rule that a creditor must identify those funds he received as proceeds of his original collateral before he can prevail over the Trustee. *See* pp. 491–492 *supra*. Although potentially $30,000 of the remaining payments to the Bank by World (totaling $514,053.37) fell within the ten-day "grace period" provided by O.R.C. § 1309.25(C) (*see* doc. 105, at 18), there was no showing that the Bank was paid out of identifiable proceeds of any accounts receivable. The Bank was paid out of commingled funds in a bank account—funds which included some pre-paid tuitions representing the student's "contract rights" as to which the Bank was unsecured and unperfected. If funds are not identifiable due to commingling with other funds which were *not* proceeds of the creditor's interest, the creditor is limited to the amount recoverable under O.R.C. § 1309.25(D)(4)(b). Defendant has presented no evidence of any amount recoverable under that subsection. Hence, we conclude that the Bank was unsecured and unperfected as to the payments it did receive and therefore that the Trustee's interest in these funds is superior. 11 U.S.C. § 96.

■ Finally, as an alternative method of analysis applicable to the entire period, we think it possible that the Bank was *never* secured and perfected as to its loan.

The student pre-paid tuitions originally represented "contract rights." *See* p. 488 *supra*. As these "contract rights" were earned by World through performance, we conclude alternatively that they ripened *directly* into "cash proceeds." O.R.C. § 1309.25(A). An account receivable is defined as a "right to payment for . . . services rendered . . . ." O.R.C. § 1309.01(A)(10). In this case, however, a "right to payment" *never existed*—the student contracts were all pre-paid. Hence, an "account receivable" never arose and the Bank's security interest did not attach to anything. U.C.C. 9–204(1)(2)(d); O.R.C. § 1309.15(A)(B)(4). The Bank was therefore unsecured and unperfected throughout the entire period in question and hence the four payments on its loan were preferential under section 60 of the Bankruptcy Act. 11 U.S.C. § 96.

Thus, our conclusion is that the entire amount of the payments made to the Bank within the four-month period are voidable as all elements of a Section 60 preference have been met by the Trustee. 11 U.S.C. § 96.

## IV

### RIGHT OF SETOFF

As a final matter, the Bank asserts that even if this Court holds the payments by World to the Bank in satisfaction of the $500,000 loan were preferential within Section 60, the Bank is entitled to a "right of set-off" against the $268,924.16 remaining in World's general account on the date of bankruptcy. Although the Bank never exercised a set-off against these funds, it attempted to "reserve" this right in the bankruptcy court upon the application of the Receiver/Trustee for an order directing the Bank to turn over these funds to the Receiver/Trustee (DX 3, 11). This issue has been extensively argued and briefed by the parties (*see* docs. 68, 72, 92, 95, 105, at 20–22, 107, at 4; letters from counsel dated March 14, 1977 and March 17, 1977). We therefore make the following findings and conclusions.

Plaintiff argues that defendant had no right of set off as of the date of bankruptcy because prior to that date the Bank loan had been fully paid (doc. 94, at 73–74). Hence, on the date of bankruptcy, there were not "mutual debts or mutual credits between the estate of [the] bankrupt and [the] creditor" for the allowance of a set-off as provided in Section 68a of the Bankruptcy Act. 11 U.S.C. § 108a. *See also* 4 Collier on Bankruptcy ¶ 68.04 (1978). Alternatively, the Trustee argues that, even if the Bank had a "right of set-off" as of this date, its own prior conduct in establishing the control account ("collateral account") in order to secure repayment of its loan should estop it from asserting this right or constitute a waiver of its right (doc. 105, at 21 *citing First National Bank of Portland v. Dudley*, 231 F.2d 396 (9th Cir. 1956); doc. 88, at 10). Defendant's assertion of a right of set-off, plaintiff urges, "does not exist in a vacuum"—"It must be considered in light of all the facts and circumstances leading up to that date," including the establishment of the control account (doc. 105, at 21).

Defendant, in response, contends that sections 57g, 57n and 68a (11 U.S.C. §§ 93g, n, 108a) operate to revive and preserve the indebtedness of World to the Bank for the purposes of a "set-off" if the payments on this debt are voided as preferential under § 60. The Bank's arguments, as we understand them, are as follows: Section 68b(1) (11 U.S.C. § 108b(1)) of the Bankruptcy Act provides that "a set off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable under [Section 57g]." That section provides that the claims of creditors who have received preferences shall not be allowed "unless such creditors shall surrender such preferences . . . ." 11 U.S.C. § 93g. Finally, Section 56n of the Act (11 U.S.C. § 93n) provides that:

[A] claim arising in favor of a person by reason of the recovery by the trustee from such person of money or property, or the avoidance by the trustee of a lien held by such person, may be filed within

thirty days from the date of such recovery or avoidance, but if the recovery is by way of a proceeding in which a final judgment has been entered against such person, the claim shall not be allowed if the money is not paid or the property is not delivered to the trustee within thirty days from the date of the rendering of such final judgment, or within such further time as the court may allow. (*See also* Bankruptcy Rule 302(e)(3)).

Thus, the Bank contends, the voiding of the payments as preferential give the Bank a potentially provable and allowable claim against the estate in the value of its debt (doc. 92, at 1–2). Invoking the "historic" right of banks to set-off claims against deposits in good faith and in the ordinary course of business which otherwise would constitute voidable preferences under Section 60a, the Bank argues that "claims do exist for purposes of set-off [by a bank] although not [yet] proved or allowed" (March 17, 1977 letter from counsel *citing Zorwitz v. Okin*, 121 F.Supp. 56, 57 (E.D.N.Y.1954)). Although such a claim of "set-off" of the underlying indebtedness is not permitted for an ordinary creditor (for to do so would allow the creditor to be preferred all over again), the Bank argues that it has such a right of "set-off" because of the "historic" distinction drawn between preferences and set-offs with regard to banks. In essence, the Bank argues that the voiding of payments made to it by World as preferential merely serve to reestablish its claim and, since *on the date of bankruptcy* it was acting in "good faith" and "in the ordinary course of business," it can exercise a right of set-off in the amount of its claim against the amount present in the debtor's general accounts on that date. Finally, the Bank denies that it "waived" its right because it specifically "reserved" this right in the Bankruptcy Court, which "recognized and approved it. . . ." (March 17, 1977 letter from counsel, at 3) (DX 3).

 We have been unable to locate any authority on this issue. After much consideration, however, we conclude that

the Bank's position is correct. It is clear, we think, that as of the date of bankruptcy the Bank was acting in good faith and in the ordinary course of business. 11 U.S.C. § 108a. The purpose of Section 57g of the Act is to compel restoration of the preferential payment, not punishment of the recalcitrant creditor. *In re George M. Hill Co.*, 130 F. 315 (7th Cir. 1904); 3 Collier on Bankruptcy ¶ 57.19, at 307 (1977). Hence, once a creditor voluntarily or involuntarily surrenders his preference within the time limits established by Section 57n (11 U.S.C. § 93n; Bankruptcy Rule 302(e)(3)), he may present his claim along with the other general creditors of the bankrupt. A Bank, however, is on a different footing than other general creditors since "even though the depositor was insolvent and knowledge of this fact could be charged against the Bank at the time when the deposit was made, the Bank is still entitled to apply the deposit on its claim so long as it was accepted in good faith, in the ordinary course of business." 4 Collier on Bankruptcy ¶ 68.16, at 912, 919 (1978). We think the surrender of the Bank's preference within the applicable time limit would make the claim on its debt both provable and allowable under the Act. 11 U.S.C. §§ 93g, 93n. We see no reason why the Bank cannot assert this right of set-off as a defense to this plenary proceeding. *Zorwitz v. Okin*, 121 F.Supp. 56, 57 (E.D.N.Y.1954). The Bank clearly did not waive its right since a right of set-off may be asserted after the filing of the petition as a defense in a suit to set aside a preferential transfer. 4 Collier on Bankruptcy ¶ 68.05[2] (1978). The Bank herein asserted its right of set-off against the funds on deposit at the date of bankruptcy at the time it was ordered by the Bankruptcy Court to turn over those funds to the Trustee (DX 11). We think this was sufficient to preserve the Bank's claim. Courts have recognized other situations where the creditor's duty to surrender has been alleviated and a set off or credit allowed. 3 Collier on Bankruptcy ¶ 57.19[4]–[4.3] (1977). We are sensitive to the Trustee's appeal to this Court's equitable powers. The privilege of set-off under § 68a "is permissive, not mandatory [and] . . . . its application, when invoked, before a court, rests in the discretion of that court, which exercises such discretion under the general principles of equity." 4 Collier on Bankruptcy ¶ 68.02, at 851–52 (1978). *See also First National Bank of Portland v. Dudley*, 231 F.2d 396, 398 (9th Cir. 1956). We fail to see under the facts herein any equitable reason to deny the Bank this right of set-off. We therefore hold that Sections 57g and 57n operate to preserve the right of the Bank to set off against its claim on the Bank loan in the amount of the funds remaining in the debtors' general accounts as of the date of bankruptcy (268, 924.16). These were "mutual debts or mutual credits," we think, within the meaning of Section 68a of the Act. 11 U.S.C. § 108a.