In re SOUTHERN EQUIPMENT SALES CO., INC., Debtor.

JOHN DEERE INDUSTRIAL EQUIPMENT CO., Plaintiff,

v.

SOUTHERN EQUIPMENT SALES CO., INC., and Joseph M. Weinberg, Trustee, Defendants.

Bankruptcy No. 81–04477.
Adv. No. 81–0466.

United States Bankruptcy Court, D. New Jersey.

Nov. 23, 1982.

---

W.T. Windsor, Jr., Saul, Ewing, Remick & Saul, Philadelphia, Pa., for plaintiff.

DuBois, Sheehan, Hamilton & DuBois by Madison DuBois, Camden, N.J., local counsel for plaintiff.

Joseph Weinberg, P.A. by Joseph A. McCormick, Jr., Haddonfield, N.J., for trustee.

C. Peter Burro, Haddonfield, N.J., for debtor.

## OPINION

WILLIAM LIPKIN, Bankruptcy Judge.

Plaintiff John Deere Industrial Equipment Company filed a Complaint against the debtor, Southern Equipment Sales Company, Inc., and its Trustee, seeking to lift the automatic stay of Section 362 of the Bankruptcy Code in order to reclaim certain personal property and to enforce its security interest in funds in plaintiff's possession. The Trustee filed an answer, in the form of a general denial, and a counterclaim, which sought the turnover of funds in plaintiff's possession, namely a reserve account and a contingent earnings account. During the pendency of this proceeding both parties agreed that the personal property sought to be reclaimed by plaintiff was returned to it. Therefore, the only issues to be resolved are the validity and extent of the plaintiff's alleged security interest or right to setoff in the funds constituting the reserve account and the contingent earnings account.

The relevant facts concerning the transactions between the parties are not disputed. At an unspecified date, the debtor became a dealer for the plaintiff, which encompassed selling, leasing and financing of industrial equipment manufactured by plaintiff. In order to specify their obligations in the dealer relationship, the parties entered into a Leasing Agreement, a Finance Agreement and a Security Agreement, but only the most recent versions of these agreements were presented to this court.

The dealer relationship between the debtor and John Deere was terminated on October 1, 1980, and no further purchases of chattel paper were made by John Deere after that date, although deals in progress were processed through December, 1980. After this time John Deere continued to collect payments due from the debtor's customers pursuant to a lease or sales contract. Deductions would be made from the dealer reserve and the contingent earnings account when John Deere suffered a loss as the result of a lease or sale initiated by the debtor.

Under the security agreement, executed as of May 2, 1978, the debtor granted a security interest to John Deere in all inventory, including additions, replacements, proceeds and "proceeds of proceeds". The inventory was comprised of industrial and agricultural machines and equipment and parts, which the debtor would then lease or sell to its customers. Under the security agreement, the debtor agreed to pay all present and future indebtedness owed to John Deere "for or incident to the purchase of goods" regardless of the form of the indebtedness.

Pursuant to the security interests created by the security agreement, the debtor signed several financing statements, which were filed in the Gloucester County Clerk's Office and the office of the New Jersey Secretary of State in November and December °1978. All financing statements have a "check" in the box indicating that proceeds of collateral are covered and contain the following description of collateral:

1.  Inventory consisting of:

    A.  Agricultural, construction, industrial, and logging machinery and equipment of all kinds (including items acquired after the date of this statement and including used machinery and equipment), which terms include but are not limited to, tractors (crawler and wheel-type), tillage, planting, cultivating, fertilizing, harvesting, and farmstead machinery and equipment, backhoes, dozers, scrapers, loaders and earthmovers.

    b.  Lawn and Garden Tractors and implements usable therewith (including items acquired after the date of this statement).

c. Components of any of the above attachments, accessories, and repair and replacement parts usable with or in any of the above (including in each case items acquired after the date of this statement).

2. Accounts or contract rights owed to the debtor by any company affiliated with secured party or engaged in the business of distributing John Deere products.

The Trustee does not appear to challenge these financing statements as properly perfected, but argues that the reserve account and contingency earnings account are not within the terms of the security agreement or financing statement as collateral.

The leasing agreement, executed in April 1980 and the financing agreement, executed in June 1980, had similar terms for the establishment of the reserve accounts and contingency earnings account. After execution of a lease or sales contract between a customer and the debtor, the debtor assigned its right to payments to John Deere, and the customer was instructed to make all payments to John Deere. Then, the invoice price of the equipment would be credited to the debtor's account by allocation of 99% of the wholesale price to the debtor's on-going account with John Deere, and one percent of the total price to the "dealer reserve account".

John Deere was entitled to make deductions from the dealer reserve account resulting from any customer defaults on the leases or sales contracts negotiated by the debtor. Expenses in repossession and collection of the payments due from customers were also authorized as deductions from the dealer reserve account. The reserve account was credited with annual interest of 8% on the average monthly balance, and the debtor received monthly reports regarding all activity on the account.

Any amount exceeding 3% of the outstanding obligations of any type at the end of each year was to be paid over to the debtor. However, no sums were ever paid to the debtor from the dealer reserve account, because of the large obligations owed by the debtor to John Deere.

John Deere did not maintain separate reserve accounts for each type of transaction or for each of its dealers; instead, it kept all money in one account and merely maintained separate records of what each dealer was owed. This is consistent with John Deere's right, under its contracts, to apply any excess resulting from one type of transaction to any outstanding obligations due from a debtor resulting from a different transaction.

The John Deere Dealer Finance Agreement also provided for the establishment of a contingent earnings account for sales contracts in which John Deere decided to extend only a partial credit or financing to the debtor's customers, which Deere did not deem fully creditworthy. John Deere would credit the contingent earnings account with the difference between the total sales price and the amount of credit which John Deere decided to extend to the debtor's customer. This sum was not immediately credited to the debtor's account with John Deere, because it was contingent upon the customer completing its obligations under the sales contract. The sums held in the contingent earnings account would be paid to a dealer when the net credit value of the sales contract was received by John Deere. If a loss occurred from a customer's failure to pay all installments due under the sales contract or from a deficiency resulting after repossession, John Deere was entitled to use the sums in the contingent earnings account to reduce its loss, instead of paying this amount to a dealer.

John Deere continued to suffer losses after the termination of the parties' relationship in October 1980, and they entered into an agreement dated July 23, 1981 in order to fix the debtor's liability to John Deere. Both parties recognized that the debtor owed John Deere the sum of $593,879.76 arising from the dealer relationship. However, they agreed to reduce this liability to $317,554.76 and allow John Deere to take a deductible loss for the remainder. The debtor executed a promissory note in the

amount of $317,554.76 to ensure it would perform its obligations under the agreement. The debtor was to return certain equipment obtained for sale or lease and would be credited with the sum of $192,-425.00. This left a remaining debt of $125,-129.76 owed by the debtor to John Deere for past-due indebtedness.

The agreement also granted a security interest to John Deere in the debtor's accounts receivable in order to secure the debtor's liability. There is nothing in the agreement dated July 23, 1981 rescinding the debtor's prior obligations under the leasing and finance agreements, and no action was taken to void the prior perfected financing statements filed by John Deere.

On July 30, 1981, the debtor filed a Petition under the Bankruptcy Code. At that time the chattel paper outstanding had been reduced almost one million dollars from that held by John Deere 90 days before the filing of the Petition. The dealer's reserve account for the debtor had been reduced by several thousand dollars. After the debtor filed its Petition, there was additional activity in all these accounts. Customers paid some of their debts. John Deere did not observe the automatic stay of Section 362 of the Code, and reduced the contingent earnings account to zero and the dealer's reserve account to a negative balance. John Deere argues that these actions did not violate the automatic stay because these accounts were not property of the estate.

Under Section 541(a)(1) of the Bankruptcy Code, "all legal or equitable interests of the debtor in property as of the commencement of the case" becomes "property of the estate". The Legislative History contains the following analysis of the extent of this property:

> ... the estate is comprised of all legal or equitable interest of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action ..., and all other forms of property currently specified in section 70a of the Bankruptcy Act ... as well as property recovered by the trustee under section 542 of proposed title 11, if the property recovered was merely out of the possession of the debtor, yet remained "property of the debtor."

This statute defines *all* legal and equitable interests held by a debtor as property of the estate. See *Matter of Valairco, Inc.,* 9 B.R. 289 (Bkrtcy.N.J.1981), where a subcontractor-debtor was held to have an equitable interest in funds in the hands of the owner of property, even though the general contractor on the construction contract was the party who was to receive direct payment from the owner.

Thus, in the present case, although the debtor did not have possession of the dealer reserve account or the contingent earnings account, nor were these accounts segregated in the debtor's name, such possession or title is not a prerequisite to a finding that the accounts were property of the estate. In the case of *Matter of American Motor Home Rentals,* 10 B.R. 53 (Bkrtcy.W.D.Mo.1981), a Trustee sued to recover the debtor-salesman's credits in a dealer reserve account, held by the debtor's employer. The reserve account arose from the employer's purchase of the salesman's contracts with customers and was to be paid to the salesman upon the customer's successful completion of their contracts. The court held that the reserve account was "property of the estate," and distinguished a "loss reserve" account, which would be composed of the employer's money. 10 B.R. at 54-55.

This court agrees that, at least, the dealer reserve account in the present case was property of the estate. Although the account was held by John Deere, the debtor had an equitable interest in it, because it represented contract proceeds earned by the debtor, interest accrued on this money for the debtor's benefit, and the debtor was entitled to money held, after the successful payment by customers.

However, it does not necessarily follow that the Trustee is entitled to the amount held in the dealer reserve account just be-

cause it was property of the estate, as occurred in *Matter of American Motor Home Rentals,* supra. John Deere could still have a perfected security interest in this account or be entitled to set it off against the debt due. These issues will be discussed *infra.*

The contingent earnings account did not arise in the same manner as the reserve account, and whether it was property of the estate is a more difficult issue. John Deere used its own funds to credit the contingent earnings fund, as a result of its decision that the customer procured by the debtor was not wholly creditworthy. This money was not treated as "earned" by the debtor until the customer completed the payments due. Therefore, the debtor had neither a legal nor an equitable right to this money until the customer performed its contract in full. But, interest accrued on this account at the rate of 8% per year for the debtor's benefit. The debtor had a contingent equitable interest in the account. Whether this is sufficient to classify this account as property of the estate need not be determined if John Deere also had a perfected security interest or right of setoff in this account. If John Deere had a perfected security interest or right of setoff in these accounts, it is entitled to them, even if they can be labelled property of the estate. 11 U.S.C. § 362(d).[1]

The Trustee relies on the case *Matter of American Motor Home Rentals, Inc.,* supra, 10 B.R. 53, because there, the court held that the dealer reserve account was property of the estate, was not subject to setoff and had to be turned over to the trustee. However, that case is distinguishable, because under the terms of the contract in that case, the debtor had an absolute right to payment of money held in the account as an "excess" over the finance charges owed to the employer. The alleged claim of setoff by the employer involved a deficiency incurred from a repossession from customers of the debtor-salesman. The employer could not prove that the debtor was responsible for this deficiency and there was no other deficiency existing at the time of the filing of the petition, which would allow a setoff. The court recognized that post-petition losses could not be setoff against prepetition reserves under section 553 of the Bankruptcy Code.

In the present case, the terms of the contract are clear that the debtor is ultimately responsible for any losses caused by his customers, even though the debtor was entitled annually to the excess amount over 110% of its debt to John Deere or the excess over 3% of the outstanding contract amounts owed to John Deere generated by the debtor. The debtor's right to payment under these contract clauses never arose. Both parties rights here pre-dated the termination of their relationship in October 1980, and their mutual debts certainly occurred pre-petition.

The Trustee also relies on the case *In Re Cosner,* 3 B.R. 445 (Bkrtcy.Or.1980), which was decided under the prior Bankruptcy Act. In that case, the court held that a capital reserve account, held by a farm cooperative of which the debtor was a member, was "estate" property vested in the bankruptcy trustee even though the debtor's share was not immediately payable to him. Nor did the cooperative have a right of setoff for debts owed to it from the debtor, because the cooperative's future debt to the debtor arising from this account was not mutual. The court also held that the cooperative did not have a perfected security interest in the account by mere possession of the fund under the Oregon Uniform Commercial Code, and would have had to file financing statements to be perfected. Thus, the trustee was entitled to the amount in the capital reserve account credited to the debtor.

The present case is distinguishable because John Deere filed financing statements to perfect its security interest in the accounts, and both John Deere and the debtor had an existing indebtedness to the other before the debtor's petition was filed.

1. Note that this court is not condoning John Deere's violation of the automatic stay as to property of the estate, but any violation is not egregious because only debits and credits on an account balance were changed, and this will not affect John Deere's ultimate liability.

In arguing that John Deere has a perfected security interest in the accounts, Deere advances two theories: 1) it is perfected by possession of the accounts, and 2) it is perfected by the filing of financing statements covering inventory and proceeds. Perfection by filing will be discussed first.

■ The Trustee does not dispute that John Deere has a perfected security interest in the debtor's inventory and proceeds, but argues that the reserve account and earnings account are not "proceeds." See N.J. S.A. 12A:9–103(2) and N.J.S.A. 12A:9–401, indicating that John Deere's lien was properly perfected. The definition of "proceeds" is set forth in N.J.S.A. 12A:9–306(1) as follows: [2]

> (1) "Proceeds" includes whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of. The term also includes the account arising when the right to payment is earned under a contract right. Money, checks and the like are "cash proceeds." All other proceeds are "non-cash proceeds."

All money which John Deere placed in its dealer reserve account and contingent earnings account were clearly "proceeds" of the inventory kept by its dealers. The dealers sold or leased the inventory held by them, and John Deere received all payments from customers which were generated by the sales or leases. This money was "received when collateral (i.e. inventory) . . . is sold, . . . or otherwise disposed of." Part of these proceeds were then placed in the reserve account or contingent earnings account. The Trustee does not explain how the same money was then transformed into something other than "proceeds." Whether it was credited to the dealer's account or credited to the reserve or contingent earnings accounts, these credits were proceeds. See *Hercules Inc. v. General Magnetic Tape Co.*, 180 N.J.Super. 206, 434 A.2d 636 (App. Div.1981), where the court held that customs duty rebates were proceeds of inventory and thus perfected within the terms of

a filed financing statement covering inventory and proceeds.

■ The Trustee argues that even if these accounts are proceeds, they are not identifiable, within the meaning of N.J.S.A. 12A:9–306, because they were commingled with the accounts of other dealers. However, a "commingling" is not determinative as to whether proceeds are "identifiable;" rather, the New Jersey Study Comment to N.J.S.A. 12A:9–306 indicates that as long as proceeds are "traceable" their perfected status continues. See also *Cissell v. First Nat. Bank*, 476 F.Supp. 474, 492 (S.D.Ohio 1979) and *Anderson, Clayton & Co. v. First American Bank*, (Okl.1979), 29 UCCRS 280, where "tracing principles" were held sufficient to determine the identifiability of proceeds. In the present case, the dealer reserve account and contingent earnings account can be traced to the money received from customers on the sale or lease of inventory. The reserve and contingent earnings accounts were segregated from all of John Deere's other receipts and funds, and the amounts resulting from each dealer were specifically accounted for. These proceeds were traceable and identifiable, and John Deere had a perfected security interest in them as a result of its proper filing of the financing statements under New Jersey law. In addition the problem of "commingling" arises only when funds are to be traced in the debtor's hands and not the creditor's.

Both parties have also presented an argument as to whether possession of the accounts by John Deere are sufficient to perfect the security interest in them.

The case of *New Jersey Bank (National Association) v. Community Association/Farms, Inc.*, 666 F.2d 813 (3rd Cir. 1981), specifically dealt with the right to a reserve account held by the plaintiff bank in an interpleader action claimed by a judgment creditor and the United States by way of a tax lien. The bank held a reserve account of 10% arising out of the chattel paper sold to the bank and this fund was

---

**2.** This statute was in existence when the financing statements were filed. It has since

been changed, and any relevant changes will be discussed.

freed up when the bank was paid in full, which then led to the two claims. However, while the amount due the bank was unpaid, the reserve account was recognized as constituting, along with the account receivables, security for payment of the bank's debt. The creditors could only reach the fund after the bank was paid in full. In this case John Deere has not been paid off in full. In fact, even after application of the reserve account, there will be a deficiency to John Deere.

The Trustee argues that the granting of the security interest under the agreement dated July 23, 1981 was an avoidable preference under section 547 of the Bankruptcy Code, because it was a transfer for an antecedent debt. The agreement of July 23, 1981, though within the 90-day preference period, did not create preferential transfers to John Deere. The execution of the agreement did *not* enable John Deere to receive more than it would have if the case were under Chapter 7, the agreement had not been made and Deere received payment to the extent it was entitled, 11 U.S.C. § 547(b)(5).

John Deere had previously perfected its security interest in the accounts prior to the preference period, and the large indebtedness owed to Deere from the debtor, which arose prior to October 1980, had not been eliminated. Proper financing statements were filed in 1978 and were valid to continue perfection in the collateral and proceeds for a period of 5 years. N.J.S.A. 12A:9–403(2); *Credit Alliance Corp. v. Jebco Coal Co., Inc.,* 688 F.2d 10 (3 Cir.1982). The 1978 financing statements perfected the proceeds held by John Deere at the time of the debtor's petition, even though the July 23, 1981 agreement was within the preference period. Thus, John Deere had a perfected security interest in the dealer reserve account and contingent earnings account and will not receive more than what it would have under Chapter 7 and if the July 23, 1981 agreement had not been executed.

Because this court finds that John Deere had a perfected security interest in the dealers' account, and there was no "excess"

due to the debtor, the arguments concerning John Deere's alleged right of setoff under section 553 of the Bankruptcy Code need not be discussed. However, I note that, contrary to the Trustee's argument, John Deere was owed the sum of $125,-129.76 on the date the debtor's Petition was filed and also 90 days beforehand. Its secured position was not improved during the 90 days prior to the filing of the Petition. Therefore, John Deere did not have to rely on future, contingent claims which might arise from third-party customers as evidence of indebtedness due from the debtor.

Thus, John Deere had a perfected security interest in the dealer reserve account and contingent earnings account and is entitled to relief from the automatic stay to apply those accounts to the sums owed to it from the debtor. The relief sought in John Deere's complaint is granted, and the counterclaim is denied. Let an order be submitted in accordance with this opinion.