**In the Matter of TOTAL TECHNICAL SERVICES, INC., and TTS, Inc., Debtors.**

**TOTAL TECHNICAL SERVICES, INC., Plaintiff,**

v.

**William D. WHITWORTH, Defendant.**

**Bankruptcy No. 89–413.**
**Adv. No. 89–108.**

United States Bankruptcy Court, D. Delaware.

Jan. 13, 1993.

---

Stephen W. Armstrong, Charles M. McCuen, Philadelphia, PA, Richard Elliott, Jr., Todd V. Jones, Wilmington, DE, for debtors, plaintiff.

Stephen W. Spence, Wilmington, DE for defendant.

## MEMORANDUM OPINION
## AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

In this adversary proceeding, the debtor Total Technical Services, Inc. seeks to avoid alleged preferential transfers to the defendant William D. Whitworth totaling $245,000. This is the court's decision after trial on this core matter. 28 U.S.C. § 157(b)(2)(F).

### I. *Facts*

TTS, Inc. was in business from 1965 to approximately 1990. Total Technical Services (Services), which incorporated in Delaware in 1978, is a wholly-owned subsidiary of TTS, Inc. In recent years, TTS and Services specialized in the servicing, refurbishment and adaptation of computer equipment for lease and sale in the United States as well as in China and Europe.

TTS and Services experienced operating losses in 1980 and in each subsequent year. Both corporations filed Chapter 11 petitions in this court on July 14, 1989. On July 31, 1990, the two proceedings were substantively consolidated. A liquidating plan for TTS and Services was confirmed on November 11, 1990.

William Whitworth joined Services in 1972 and served as its Senior Vice President from July 1979 to January 30, 1988. At that time, Whitworth considered resigning his position. However, he continued working at Services until June 30, 1989. The nature and scope of his employment during this last time period is disputed.

### A. The Payments Totaling $70,000.

The $245,000 that Services seeks to recover in this adversary proceeding is the sum of two sets of payments.[1] The first set involves 14 $5,000 payments Services made to Whitworth, for a total of $70,000. These payments were made between July 1982 and October 1984. The purpose of the payments is disputed.

### B. The Payments Totaling $175,000.

The second set of payments involves three payments by check from Services to Whitworth totaling $175,000. One check, for $55,000, was issued within one year of the petition date. Another check for $65,000, was issued within 90 days of the petition date. The third check, also for $55,000, was dated July 12, 1988 (more than one year before the petition date), and was honored by Services' bank, United Jersey

---

1. The complaint also sought to recover other payments totaling $52,081.15. As to those payments, however, this court granted Whitworth's oral motion for a directed verdict on July 18, 1991.

Banks, on July 21, 1988 (within one year of the petition date). These three payments were in addition to an annual salary of $175,000 which Whitworth received in monthly payments of $14,583.33. The purpose of the three payments is also disputed.

Services' complaint against Whitworth seeks to avoid the $175,000 and $70,000 transfers pursuant to 11 U.S.C. § 547(b). The remainder of the court's findings of fact will be developed during the discussion of each transfer.

## II. *The Elements of a Preference Action.*

The Bankruptcy Code allows the Debtor Services to:

[A]void any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive [under a Chapter 7 liquidation.]

11 U.S.C. § 547(b); § 1107(a). Whitworth disputes that Services has met its burden of proving these elements of a preference with respect to each category of payments. § 547(g). In addition, Whitworth raises several affirmative defenses which are discussed in Section V.

## III. *The $70,000 transfer is not a voidable preference.*

█ The first part of Services' preference action seeks to recover 14 payments of $5,000 totaling $70,000. These payments were made during the period July 1982 through October 1984.

Services asserts these payments were interest-free demand loans to Whitworth. In support of this assertion, Services introduced several documents *it* created for accounting and tax purposes that state the $70,000 was a loan.

Whitworth, however, disputes the characterization of the payments as loans. Prepetition, he asserted that the payments were for bonuses earned in 1983 and 1984. He also refused to sign annual audit confirmation letters Services sent him concerning the purported loan nature of the payments in 1985 and 1988. *See* Plaintiff's Exhibit 23 (hereinafter "PE–"); PE–24.

Moreover, in May or June of 1989, Services issued to Whitworth a 1099 tax form indicating a payment of $135,000 in "compensation." PE–10. Of this amount, $65,000 correlated to a $65,000 check Whitworth received (fully discussed in Section IV.). According to William D. Alpert, President of TTS, the remaining $70,000 correlated to the 14 $5,000 payments, and Services acknowledged by the issuance of the 1099 form that the payments were to be treated as compensation rather than a loan. The court finds Services did not prove the payments to Whitworth were employee loans.

█ A related problem also undermines Services' preferential transfer theory. Services must show that within the appropriate preferential period of one year or ninety days prior to the petition date that there was a "transfer of an interest of the debtor in property" made "on account of an antecedent debt owed by the debtor before such transfer was made." Section 547(b)(2) and (4). The transfers here were made many years before the petition date and the timing requirement cannot be satisfied.

To circumvent this requirement, Services argues that it transferred an interest to Whitworth when it issued the 1099 form in 1989. Services presents no legal support for this novel argument. If this argument were accepted, all evidence other than the date of issuance of the 1099 form would become irrelevant. This result is inconsistent with the Bankruptcy Code, case law, and indeed, Services' own position on other transfers discussed in this Opinion. The

1099 tax document did not create a transfer of interest. It merely declared Services' position on the tax treatment of the prior transfers.

Finally, as Whitworth points out, if Services was correct that the payments were loans, then it would be unable to prove that transfers were made "on account of an antecedent debt owed by the debtor." Section 547(b)(2). A loan to Whitworth would create a debt owed by him *to* the debtor. In summary, Services' attempts to characterize the $70,000 in payments as a preferential transfer are internally inconsistent and without merit.

IV. *The $175,000 transfer is a voidable preference.*

■ Addressing next the $175,000 transfer, three employment agreements set the stage for resolution of the "antecedent debt" and "insider" sub-issues of § 547(b). The first agreement, executed in September 1987, continued Whitworth's employment as a Senior Vice President of Services at a base annual salary of $175,000, with a bonus at the rate of five percent of the annual net operating profit. JE–8. This salary structure continued the prior structure in place since 1985. The principals of Services often referred to the bonuses as "commissions."

Due to cash flow problems, Services did not pay Whitworth all the compensation he earned pursuant to this agreement. This nonpayment problem, as well as Whitworth's concern about his future job security, precipitated employment discussions in January 1988 between him and George R. Stackfleth, the President of TTS at that time. During their discussions, Whitworth asserted that Services had failed to pay him $232,000 in unpaid salary and bonuses. Stackfleth believed the figure was no more than $110,625. The two finally agreed upon a compromise figure of $175,000. Because of the cash flow problem Services was experiencing, the two recognized that Whitworth could not be paid this amount immediately.

Prior to January 1988, Whitworth had spent a substantial amount of time developing business for Services in China ("the China contracts"). The two anticipated that if Whitworth continued to work on the China contracts after January 1988, the revenues from those contracts would provide sufficient cash to pay him his owed compensation. The parties further anticipated that the work on the China contracts would be completed by June 1988, at which time Whitworth intended to resign.

The result of these discussions was a January 26, 1988 agreement Stackfleth drafted. The agreement was intended as a "settlement of your contract dated September 1, 1987." JE–9. The agreement specifically incorporated the compromise on the unpaid past compensation:

At the end of this period [ (June 30, 1988) ] you may choose to take settlement of past commissions owed and in settlement of your current contract by one of the following: (1) lump sum payment of $175,000, (2) monthly payments as salary for one year, or any combination of (1) and (2) totaling $175,000.

*Id.* Stackfleth asserted at trial he did not mean what he wrote in the agreement—the court finds that testimony not credible.

For the period January 15, 1988 through June 30, 1988, the agreement *also* entitled Whitworth to a "contract salary rate of $175,000." *Id.*

Thus, the January 1988 agreement obligates Services to pay Whitworth two $175,000 amounts—one for a prospective annual salary, and one in settlement for past compensation. *E.g.*, Docket No. 20, at 86–87, 88. This numerical coincidence has possibly contributed to the parties' differing views of the contractual purpose of the three payments Services now attempts to recover.

As of June of 1988, the work on the China contracts had not been completed as originally anticipated, and Services was unable to pay Whitworth any of the $175,000 settlement payment as set out in the January agreement. Accordingly, on July 8, 1988, the parties entered into another letter agreement which changed the timing of the "lump sum payment of $175,000" referred to in the January contract. The July

agreement provided that Whitworth would receive three payments of $55,000, $55,000 and $65,000, respectively. The timing of the latter two payments was related to the receipt of additional China revenues.

### A. The three transfers were on behalf of antecedent debts.

An antecedent debt exists when the debt is incurred before the transfer. 4 *Collier on Bankruptcy* ¶ 547.05, at 547–35–36 (1991). The above history of events satisfies Service's burden that the $175,000 in payments were made for previously earned compensation and thus were made on behalf of an antecedent debt.

Whitworth's arguments that there is no antecedent debt are without merit. He primarily argues that the three payments totaling $175,000 were not antecedent debts because they were made for his contemporaneous services on the China contracts. He is wrong. During the period of January 1988 through June 1989, Whitworth was already receiving monthly payments of $14,583.33 (corresponding to his $175,000 annual salary). While consummation of the China contracts would provide the *source* of the funds for payment, it is quite evident that the *obligation* to pay those funds arose previously when Services failed to pay to Whitworth salary and commissions he had earned prior to January 1988. Whitworth's other arguments do not merit discussion.

### B. Whitworth is an insider.

■ An "insider" includes an officer of the debtor and a person in control of the debtor. 11 U.S.C. § 101(31)(B). Whitworth testified that in his opinion he was a mere consultant and not an officer. He also argues that he was not an officer because he was not elected to a corporate office in accordance with Delaware corporation law. While these factors may be relevant in a § 547(b)(4)(B) inquiry, here there is an overwhelming preponderance of evidence, a sample of which is discussed below, that Whitworth's role at Services satisfies the alternative definitions of § 101(31)(B) during the relevant time period. Whitworth's testimony and arguments in this regard are therefore rejected.

First, the January 1988 agreement allowed Whitworth to retain his "company benefits" and contemplated that he would remain in charge of the China operations. JE–9. He signed this agreement as "Senior Vice President Total Technical Services." *Id.*

Furthermore, this agreement discussed an option available to Services (never exercised) to hire Whitworth as an "independent contractor," at a "fee" of $50,000 per year plus expenses. This compensation package is totally different from the one Whitworth actually received after January. The court infers from these differences in language and compensation terms that the remainder (and bulk) of the agreement contemplated hiring Whitworth as an employee, and not as an independent contractor.

Of most significance, the July agreement explicitly maintained Whitworth's prior employment status and responsibilities. The prior (September 1987) agreement employed Whitworth as a Senior Vice President. The July agreement stated: "Clearly, the objective of the Company is to retain you permanently as a full time employee functioning in the role of Chief Operating Officer of Total Technical Services, Inc." JE–12. Whitworth also signed this agreement as Senior Vice President. The record is also replete with evidence that Whitworth acted consistent with the roles described in both the January and July agreements. Thus, in both form and substance, Whitworth was *a* person in control of Services. Indeed, it is hard to conceive of more persuasive evidence to satisfy the definition of an "insider."

### C. The transfers were made within the preference period.

■ Since Whitworth was an insider, the preference period extends to one year before the petition date. Section 547(b)(4)(B). The petition date was July 14, 1989. With respect to the $55,000 check dated July 12, 1988 and honored on July 21, 1988, the Supreme Court has ruled that the date of honor should be used in determining

whether the transfer falls within the preference period. *Barnhill v. Johnson,* —— U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). Therefore, all three transfers totaling $175,000 fall within the preference period.

### D. Services was Insolvent.

#### 1. *The Burden of Proof.*

■ Services must prove that it was insolvent at the time of the two transfers occurring during the time period from one year prior to the petition date to 90 days prior to the petition date. *In re Old World Cone Co.,* 119 B.R. 473, 476 (Bankr.E.D.Pa. 1990). Contrary to Services' suggestions in its briefs, the same rule applies to the one transfer (for $65,000) that occurred within the 90 days immediately preceding the petition date. Services' characterization of section 547(f) ("the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the [petition date]") is overly ambitious. This section does not change the burden of proof, which remains with the debtor. Section 547(f) changes only the burden of going forward with evidence. 119 B.R. at 477–78; 4 *Collier on Bankruptcy* ¶ 547.06, at 547–38–39 (15th ed. 1991). There is financial information of record to support Whitworth's position that the debtors were solvent. This evidence satisfies Whitworth's burden of going forward and therefore rebuts the presumption of § 547(f).

■ Most of the evidence concerning insolvency relates to an audit performed during the three months after March 1988— over one year before the petition date. Whitworth has not alleged any changed and improved financial circumstances of Services from this time forward to the petition date, and the court finds there was no improvement in Services' financial condition. The court therefore considers proof of insolvency during this audit period sufficient to show insolvency during the entire preference period. *In re Thomas Farm Systems,* 18 B.R. 541, 543 (Bankr.E.D.Pa. 1982); *accord Briden v. Foley,* 776 F.2d 379, 382–83 (1st Cir.1985).

#### 2. *Only The Balance Sheet of Services Is Relevant.*

■ Insolvency is defined by the general balance sheet test—the debtor is insolvent if the sum of the debtor's debt (liabilities) is greater than all of its property at a fair valuation. 11 U.S.C. § 101(32). Initially, Services argues that, for the purposes of the insolvency question, the balance sheet of Services and TTS *together* is what should be considered, and *not* the Services' balance sheet alone. Services believes the court's acceptance of this "consolidation" argument would greatly benefit it, as it believes TTS was insolvent at the relevant times. However, the court does not accept Services' argument.

First, as suggested by Whitworth, Services is barred from raising this argument. Services is the sole named plaintiff in this preference action (filed on December 1, 1989), which alleges that *Services* was insolvent at the relevant times. Complaint, ¶ 7. Services also did not raise the consolidation issue in the pretrial order this court approved on June 13, 1991—the relevant statement of issue in that document states: "Were the transfers made while the *debtor/plaintiff* was insolvent?" Docket No. 15, ¶ 3 (emphasis added). Finally, Services did not raise this issue in its unsolicited pre-trial brief filed on the day of trial. Thus, during the one and one-half years of pre-trial proceedings, as well as during the trial itself, Services never raised the consolidation issue.

Services first raised this issue in its post-trial brief, taking both the court and Whitworth by surprise. Under these circumstances, Services has not timely raised the proposition that Services and TTS should be considered together for the insolvency prong of § 547(b). *Sample v. Diecks,* 885 F.2d 1099, 1106–07 (3d Cir.1989).

■ Even if the court were to allow Services' eleventh-hour attempt to inject new issues into this proceeding, a brief consideration of the merits of Services' consolidation argument indicates it is without merit. The sole case Services cites in support of its position is *Cissel v. First Nat. Bank of Cincinnati,* 476 F.Supp. 474

(S.D.Ohio 1979). The *Cissel* court held that in determining whether the debtor was insolvent within the meaning of the Bankruptcy Act (11 U.S.C. § 1(19)) for the purposes of a preference action, the court would consider the parent and its subsidiaries on a consolidated basis. However, critical to that holding was the court's finding that "the [parent] and its subsidiaries were treated [on] a consolidated basis by all of the defendant's officers *during the period in question* [in which the transfers were made.]" 476 F.Supp. at 479 (emphasis added). Services argues this court's substantive consolidation order of July 31, 1990 satisfies *Cissel.* However, the two Chapter 11 cases were not consolidated until more than one year after the time period in question, and the order made no retroactive finding that would satisfy the standards of *Cissel.* Thus, the question in this preference action is whether Services *alone* was insolvent at the relevant times.

### 3. *The fair value issues.*

The parties agree that the liabilities for Services (alone) for the fiscal year ending March 31, 1988 equaled $4,876,451. The parties do, however, dispute the value of Services' assets.

As a publicly traded corporation, TTS filed annual reports with the Securities and Exchange Commission which depicted the financial condition of TTS and its subsidiaries. For the fiscal year ending March 31, 1988, Services prepared a work sheet, PE–3, that provided detailed information for TTS and all its subsidiaries. Touche & Ross, working in part from PE–3, audited TTS and its subsidiaries and prepared the Form 10–K that was filed with the S.E.C. for fiscal year 1988. JE–4. This document listed assets of $9,087,000 and liabilities of $8,647,000.

Thomas J. DiCiurcio, Services' expert witness, used these and other documents to prepare an asset balance sheet for Services alone as of March 31, 1988 listing in the left-hand column assets of $6,945,631.00. PE–40. While this amount exceeds liabilities, the left-hand column is only a starting point for DiCiurcio's insolvency analysis, as that column assumes all the figures Touche & Ross used in its audit were correct.

DiCiurcio contended at trial that some of Touche & Ross' figures were incorrect. He pointed out that the figures reflected in JE–4 and PE–3 reflect book value of assets. *See* Volume A, *AICPA Professional Standards*, § 350.22, at 463–7 (1984). At issue in the present insolvency context, however, is fair value, which is not necessarily the same as book value. *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985). For reasons that will be discussed subsequently, DiCiurcio concluded that certain of the assets were improperly and excessively valued within the context of an Chapter 11 insolvency analysis.

The middle and right-hand side columns of PE–40 reflect DiCiurcio's opinion of the adjustments necessary to fairly value these assets. According to the right-hand side column, the total value of Services' assets in March 1988 was $3,923,711—substantially less than the total of Services' liabilities. Thus, the dispute between the parties revolves around the fair value of those assets DiCiurcio contends Touche & Ross improperly valued. In order to recover the three payments totaling $175,000, Services must prove by a preponderance that the fair value of the disputed assets reduces the total value of the assets to an amount less than the liabilities (which equal $4,876,451).

Fair value is not defined by the Bankruptcy Code. Services was in business at the relevant times, and thus its assets should be ascribed a going concern or fair market value. *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir.1992). Fair value is based upon information available to the parties during the preferential time period, and not upon information that only became available after the filing of the bankruptcy petition. *See In re Davis*, 120 B.R. 823, 825 (Bankr.W.D.Pa.1990). The court will determine the fair value of Services' assets within a realistic framework, and a contingent liability or asset will be discounted according to the validity and collectibility of the liability. *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 199–201 (7th Cir.

1988); 2 *Norton Bankruptcy Law and Practice*, § 32.10, at 39–40 (1992).

The court will discuss four categories of assets that in DiCiurcio's view required adjustments to properly reflect fair value: China account receivables, employee loans, inventory, and intercompany loans.

### 4. *The Contract Account Receivables Will Be Discounted.*

Joint Exhibit 4 lists as an asset $3,665,-410 in account receivables deriving from service contracts. Services argues this asset was overvalued by about $400,000. First, Services argues that some of the receivables were prematurely billed, and therefore not yet an asset of Services. Services never showed that Touche & Ross considered these premature billing amounts in computing its receivable total of $3,665,-410 as of March 31, 1988. *E.g.*, Docket No. 23, at 21–22. This argument of Services fails.

Services did show, however, that several of the receivables within Touche & Ross' total were owing for a period ranging from 3 months to over a year. These receivables totaled about $182,000. Under generally accepted accounting principles, the delay in payment raises a question of collectibility. Absent an explanation for the delay, an account reserve representing these doubtful receivables is normally established. Robert F. Meigs & Walter B. Meigs, *Accounting: The Basis for Business Decisions*, at 307 (8th ed. 1990); *See generally* Volume A, *AICPA Professional Standards*, § 311.06, at 231, § 509.21, at 636 (1984). A 100% reserve nullifies, dollar for dollar, the effect of these receivables on the asset side of a balance sheet.

An explanation for the payment delay did exist as to about $50,000 of the receivables within this $182,000 category. Services had been experiencing delays in performing its training obligations under several China service contracts corresponding to about $50,000 in receivables. These delays created possible business justifications for the consequent delay in payment owed by the other party to each of the contracts. Under these circumstances, DiCiurcio admitted an account reserve at 100% was exces-

sive. He also admitted that Services did maintain a reserve; however, it was not known whether the reserve was for any of these doubtful China receivables. Docket No. 24, at 172–73. In light of this evidence, the court reduces the value of the account receivables by $65,000, to a total of $3,600,410.

### 5. *The Whitworth "Loans" Will Be Valued At Zero.*

Services' balance sheet lists $275,900 in loans to Stackfleth and Whitworth. Services asserts those two contended the payments were "bonuses" and had no intention of repaying the loans. Services concludes that the $275,900 was uncollectible, and that the asset should be valued at zero. Ironically, Services here takes the opposite position from the position it took in Section III. In that section, this court found that Services did not prove the payments to Whitworth were loans. Thus, the "loans" to Whitworth were valueless as an asset of Services.

With respect to the payments to Stackfleth, however, the record is materially different. Stackfleth did sign an annual audit confirmation letter that characterized the payments as loans. PE–43. He also admitted at trial that he owed monies to Services. Docket No. 34, at 111–21. Finally, Services never issued to Stackfleth a 1099 tax form that asserted, as with Whitworth, the compensatory nature of the payments. Since the $205,900 in payments to Stackfleth *was* a loan, the court must consider Services' related argument—that this amount should be discounted because he had no intention of repaying the loan. This argument is without basis in fact and is furthermore irrelevant. Services never alleged or showed that Stackfleth was unable to repay the loan in March, 1988, and this asset shall be fully valued. In summary, the fair value of the employee loans is $205,900.

### 6. *The Inventory Assets Will Be Discounted.*

Schedule S–3 of PE–3 lists the total value of Services inventory as $3,072,437. For several reasons, DiCiurcio believed that the

inventory, which was predominantly spare parts, was worth only $200,000.[2]

First, the valuation of the spare parts was based on the full invoiced purchase cost of each spare part, regardless of its age. Second, Services followed a regular practice of replacing parts used in making repairs with the obsolete or damaged spare parts that were removed from the computers being repaired. These replaced parts were included as part of Services' inventory and were valued at invoice cost, even though their value was minimal.

Third, market circumstances reduced the value of the spare parts. These parts were used to service and maintain IBM computers operating at the sites of customers with whom Services had contracts. As those contracts were performed, the potential for use of the spares decreased. Services anticipated the contracts would be substantially performed in four years. In fiscal year 1988, this problem was compounded by a change in IBM's marketing policy to no longer allow third parties, such as Services, to service and maintain IBM computers.

Fourth, before April, 1989, Services sold its field service operations, including the entire spare parts inventory, for about $400,000.

Finally, Services presented undisputed evidence relating to Touche & Ross' own concerns about the value of inventory. In response to these concerns, and in connection with the 1988 audit, Services wrote down its inventory by $675,962, and transferred $1,302,000 into capitalized assets to be written off over a four year period. In connection with the 1989 audit, Touche & Ross further required Services to write off the remaining value of Service's entire inventory.

The court finds all these circumstances valid reasons to substantially reduce the fair value of the inventory to $200,000.

### 7. *The Intercompany Loans Will Not Be Considered.*

Plaintiff's Exhibit 3 shows an asset of $3,645,874 relating to the balance of a loan TTS owed Services. Services argues that TTS was unable to repay this loan during the year prior to the petition date, and that therefore this asset should be valued at zero.

Initially, the court observes that the intercompany loan has a current asset value of zero for fiscal year 1988, although for totally different reasons than those offered by Services. First, none of the prior documentation treated the intercompany loan as a current asset. Moreover, the minimal evidence presented concerning the terms of this loan did not indicate a due date within the year pre-petition, or any payment due on the loan within that year. Docket No. 34, at 166–67 ("at some future point in time the parent would pay back whatever [the balance of the loan was]").

However, this observation does not assist Services in its attempt to reduce the balance sheet value of its assets. The intercompany loan was not part of the original balance sheet calculation. Specifically, the left-hand column of PE–40, which lists Services' assets before adjustment, does not include the intercompany loan. Thus DiCiurcio, who created PE–40, did not include this loan within the balance sheet equation *before* applying his adjustments to arrive at his lower figure of $4,123,711. Indeed, while Services for some inexplicable reason argues in its briefs that the intercompany loan should be valued at zero, it does not argue that the unadjusted $6,945,631 total asset value should be reduced by the amount of the intercompany loan ($3,645,-874). Docket No. 29, at 25.

### 8. *The Purchase Offer Evidence Is Not Helpful.*

 Both parties have referred to purchase offers they contend support their

---

**2.** This was Services' position at trial, which apparently had changed slightly from its position as reflected in PE–40 (prepared in advance of trial). To confuse matters, only some of Services' briefing accords with this $200,000 figure. Other portions of its briefing assert the invento-

ry fair value is $926,417. Regardless of the varying positions taken by Services, the court shall simply determine the fair value of the inventory based upon the evidence and applicable law.

position on the insolvency issue. Stackfleth and Whitworth were themselves apparently considering a purchase of Services and related subsidiary operations. Because all the purchase offer evidence includes non-Services assets or liabilities, however, none of the evidence is helpful in considering the solvency of Services alone.

 Whitworth submits that Atlantic Financial expressed a willingness to purchase Services for between six and eight million dollars in late 1988. With respect to this offer, no evidence was presented that a firm offer had been made, what the details of the purchase offer were, or whether the offeror had performed a due diligence review of Services' assets. The court concludes this evidence carries minimal weight. *In re Energy Co-op.*, 109 B.R. 822, 825–28 (N.D.Ill.1989).

In summary, the court finds that the fair value of Services' assets in March, 1988 was $3,938,260—less than the liabilities of $4,876,451, and that Services was insolvent at all relevant times.

E. Whitworth would receive less than the amount of the transfers in a Chapter 7 liquidation.

The last element of a preference action, § 547(b)(5), requires that the distribution Whitworth would receive in a Chapter 7 liquidation be less than what he actually received. *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir.1985). Here, Whitworth's claims against Services were unsecured. *E.g.*, Claim No. 97 ($40,000 sought by Whitworth against TTS and Services on unsecured basis for "owed compensation in connection with consulting agreement"). Thus, as long as the distribution pays less than one-hundred percent to unsecured creditors, § 547(b)(5) is satisfied. 778 F.2d at 1421.

This court has already held that unsecured creditors receive no less under Debtors' Chapter 11 plan than they would under a Chapter 7 liquidation. *In re Total Technical Services, Inc.*, Ca. No. 89–413, Docket No. 127. Debtors' plan relies primarily on several adversary actions (including this one) to provide assets for distribution.

Only administration expenses and the secured debt to Ameritrust N.A. necessarily receive any distribution. Unsecured claims, such as those of Whitworth, receive distribution only if the two above classes of claims are paid in full. The record is undisputed that unsecured creditors would not be paid in full. Thus, distribution to Whitworth on account of his claims is less than one-hundred percent, and the pre-petition transfer enabled him to receive more than he would have received in a Chapter 7 liquidation.

V. *Whitworth's Affirmative Defenses Are Without Merit.*

 The court has found that Services has established a *prima facie* case that the $175,000 transfer is a preferential transfer. It is therefore necessary to consider the three affirmative defenses Whitworth raises, which rely upon sub-sections 547(c)(1), (2) and (4) of Title 11. Whitworth bears the burden of proof on each of these defenses.

The central premise of Whitworth's section 547(c)(1) defense is that the "transfer was intended by the debtor and the creditor ... to be a contemporaneous exchange for new value given to the debtor." Section 547(c)(1). Whitworth argues that the $175,000 payment was in exchange for his continued work on the China contracts and therefore contemporaneous. The court has already found, however, that the $175,000 was in settlement of previously earned compensation. Section IV.A.

The central premise of a section 547(c)(2) defense is that the payment was made on behalf "of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the [creditor.]" Section 547(c)(2). Whitworth argues that "there had been a long history of [him] negotiating with Services and agreeing to structured payment of either commissions or bonuses since Services historically had cash flow problems," Defendant's Opening Brief, at 40, and that therefore the $175,000 transfer was in the ordinary course of business.

Whitworth has not proved this creative argument. He and Stackfleth agreed to

the three payments totaling $175,000 to resolve a unique chain of events. First, there was the creation of the January 1988 agreement precipitated by Whitworth's threatened resignation, and the dispute over unpaid salary and bonuses. Related to that agreement was the parties' assumption that Whitworth's continued work on the China contracts would be completed by June, 1988, and create sufficient revenues to pay Whitworth the $175,000. This assumption turned out to be incorrect. The final link in this chain of events occurred when the parties agreed in July 1988 to a new payment structure to accommodate Services' financial situation at that time. This genesis of the three payments totaling $175,000 was hardly in the ordinary course of business. *See also In re Maloney–Crawford, Inc.*, 144 B.R. 531, 536–37 (Bankr.N.D.Okl.1992).

Section 547(c)(4), the basis for Whitworth's last affirmative defense, states in relevant part:

> The trustee may not avoid under this section a transfer—
>
> \* \* \* \* \* \*
>
> (4) to ... a creditor, to the extent that, *after* such transfer, such creditor gave new value to or for the benefit of the debtor.

*Id.* (emphasis added). Whitworth argues that he gave new value in the form of his work on the China contracts (which resulted in additional revenues for Services) after the three transfers. While the definition of new value includes work on the China contracts that Whitworth performed, § 547(a)(2), his argument fails. Whitworth never proved that any of the work he performed occurred after the three payments. Moreover, section 547(c)(4) was included in the Bankruptcy Code as a subsequent advance exception to accommodate creditors with which the pre-petition debtor had an open account. *See generally* 4 *Collier on Bankruptcy* ¶ 547.12, at 547–56.2–58 (1991). As such, this affirmative defense is inapplicable to the circumstances here.

VI. *Conclusion.*

An order in accordance with this Opinion is attached.

ORDER

AND NOW, January 13, 1993, for the reasons stated in the attached Memorandum Opinion,

IT IS ORDERED THAT:

1. The plaintiff Total Technical Services is not entitled to recover the 14 $5,000 payments totaling $70,000 from William D. Whitworth on a preferential transfer theory.

2. The plaintiff Total Technical Services is entitled to recover the three payments of $55,000, $55,000, and $65,000 totaling $175,000 from defendant William D. Whitworth on a preferential transfer theory.

3. Judgment is entered for Total Technical Services and against William D. Whitworth in the amount of $175,000.