**In re TRANS WORLD AIRLINES, INC., Debtor.**

**TRAVELLERS INTERNATIONAL AG, Appellant,**

v.

**TRANS WORLD AIRLINES, INC., Appellee.**

**Civil Action No. 95–31–JJF.**

United States District Court, D. Delaware.

Dec. 30, 1996.

---

Laurie S. Silverstein of Potter, Anderson & Corroon, Wilmington, Delaware, Michael Joseph, E. Alex Blanton, Richard A. Kirby, Joseph O. Click of Dyer, Ellis, Joseph & Mills, Washington, DC, for Appellant.

William H. Sudell, Jr., Kenneth J. Nachbar of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, David S. Kurtz, Michael J. Templeton of Jones, Day, Reavis & Pogue, New York City, for Appellee.

## *OPINION*

FARNAN, Chief Judge.

This is an appeal by Travellers International AG ("Travellers"), from the Bankruptcy Court's decision in favor of the debtor, Trans World Airlines ("TWA"), that TWA's $13.7 million deposit with the Clerk of the United States District Court for the Southern District of New York, intended as security for TWA's payment of a judgment rendered against TWA and in favor of Travellers in that court, was avoidable as a preference pursuant to 11 U.S.C. § 547(b). The issue raised by this appeal is whether the Bankruptcy Court applied the correct legal standard to the determination of TWA's insolvency required by 11 U.S.C. § 547(b)(3). For the reasons discussed, the decision of the Bankruptcy Court will be affirmed in part and reversed in part, and the case remanded to the Bankruptcy Court.

## BACKGROUND

### I.  Statement of Facts

On October 22, 1991, the United States District Court for the Southern District of

New York entered a judgment in the amount of $12.3 million against TWA and in favor of Travellers. On November 4, 1991, TWA obtained a stay of enforcement of the judgment by depositing $13.7 million in cash with the Clerk of the District Court, in lieu of a supersedeas bond. Eighty-eight days later, on January 31, 1992, TWA filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.

Following the filing of the reorganization petition, TWA commenced an adversary proceeding against Travellers to avoid and recover the cash deposit as a preference pursuant to 11 U.S.C. § 547(b) and 550. In addition, the Official Unsecured Creditors' Committee ("Creditors' Committee") in TWA's Chapter 11 case filed a separate complaint against Travellers to intervene as a party-plaintiff and seek recovery of the cash deposit for TWA as a preference.

The Bankruptcy Court conducted a trial in the TWA–Travellers adversary proceeding February 14 through 17, 1994. On November 30, 1994, the Bankruptcy Court issued its decision, holding that because the cash deposit was made within the 90 day preference period, and because TWA was insolvent at the time of the payment to the Court Clerk, the cash deposit was avoidable as a preference under Section 547(b). At issue in this appeal is the Bankruptcy Court's decision regarding TWA's insolvency on the date of the transfer.

### II.  The Bankruptcy Court's Decision

In determining whether the cash deposit with the Clerk of the Court was a preference, the Bankruptcy Court applied the five criteria enumerated in Section 547(b).[1] *Trans*

---

1.  Section 547(b) states:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made
(3) made while the debtor was insolvent
(4) made—

(A) on or within 90 days before the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made

*World Airlines, Inc. v. Travellers International AG,* 180 B.R. 389 (Bankr.D.Del.1994). In dispute in this appeal, is the third requirement, that the debtor be insolvent on the date of the transfer. 11 U.S.C. § 547(b)(3). Section 101(32) defines insolvency of a corporate debtor as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." In applying this standard, the Bankruptcy Court examined the assets and liabilities of TWA at the time the payment was made in order to determine if TWA was insolvent when the cash deposit was made.

### A. *Asset Valuation*

In discussing its valuation of TWA's assets, the Bankruptcy Court undertook an in depth analysis of the meaning of the term "fair valuation" in the context of a Section 547(b)(3) insolvency determination. *Id.* at 403. The meaning ascribed to the term "fair valuation" is crucial, in that it guides the interpretation of a debtor's financial data, which then enables a court to determine if the debtor's liabilities exceed its assets, that is, whether the debtor is insolvent.

After reviewing the parties' arguments and applicable case law, the Bankruptcy Court made several legal rulings with respect to the term "fair valuation." First, the Bankruptcy Court concluded that a valuation of assets requires a determination as to the amount of cash that could be realized from the sale of assets within a reasonable time. Second, the Bankruptcy Court concluded that in this context, TWA's approximation of a 12 to 18 month time period for a sale of assets constituted a reasonable time. Third, the Bankruptcy Court concluded that its definition of fair valuation was consistent with a "going concern" valuation, and was not a foreclosure or forced sale situation.

After arriving at the above legal conclusions, the Bankruptcy Court applied them to a review of TWA's position in the airline industry in 1991 and to an asset-by-asset review of the data supplied by TWA and Travellers. Rejecting Travellers arguments

that TWA was merely having a liquidity problem, the Bankruptcy Court found that absent a major financial restructuring, TWA was facing bankruptcy. *Id.* at 412–15. In addition, the Bankruptcy Court rejected Travellers methodology for asset valuation, finding it deficient in many ways and inconsistent with the court's definition of "fair valuation." Therefore, with the exception of areas in which TWA offered no evidence, the Bankruptcy Court ultimately adopted a majority of TWA's valuation figures. *Id.* at 415–21. As a final figure, the Bankruptcy Court concluded that the fair value of TWA's assets was $3,125,811,000. *Id.* at 421.

### B. *Debts*

In the context of its insolvency determination, the Bankruptcy Court construed the term "debt" within the meaning ascribed to it under Section 101(12). *Id.* at 422. Under this section, "debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). In determining the amount of TWA's liabilities at the relevant time period, the Bankruptcy Court examined four categories of debt: (1) debt obligations, (2) aircraft lease obligations, (3) medical and dental benefits obligations and (4) contingent liabilities. With respect to each of these categories, the Bankruptcy Court made a number of specific holdings and findings that are relevant to this appeal.

As to the debt obligation category, the Bankruptcy Court held that Travellers' position that "liabilities be determined at their fair value" was inconsistent with the plain wording of Section 101(32) and unsupported by case law and logic. *Trans World Airlines,* 180 B.R. at 423. Specifically, with regard to TWA's public debt, the Bankruptcy Court concluded that the debt holders "bargained with the debtor to recover the face amount of their claim and [that] . . . is what Section 101(32) contemplates." *Id.* at 423. The Bankruptcy Court dismissed Travellers' argument that TWA reached an agreement with groups of public note holders to eliminate $1 billion of debt, finding no factual support for such an agreement. Based upon

(C) such creditor received payment of such debt to the extent provided by the provision

of this title.

its interpretation of the term "debt," the Bankruptcy Court found that TWA's debt obligations on November 4, 1991, were $1,776,752,000.

Regarding the categories of aircraft lease obligations and pension plan obligations, the Bankruptcy Court accepted TWA's expert reports. Travellers' calculations were dismissed because of perceived deficiencies in their expert reports.

As to medical and dental benefits obligations, which the parties agreed amounted to a $400 million liability, the Bankruptcy Court rejected Travellers' argument that this was offset by a corresponding $400 million asset. In rejecting this position, the Bankruptcy Court asked whether having this liability was of any value to TWA. Declaring that this liability was not a saleable asset and had no market value, the Bankruptcy Court concluded that "[g]iven the orderly sale of assets scenario which I find applicable to this case, I conclude that having the liability has no value to TWA which can be considered an asset in the determination of TWA's insolvency." *Id.* at 427.

Regarding the category of contingent liabilities, the Bankruptcy Court adopted the position that contingent liabilities should be included in determining the sum of TWA's debts under Section 101(32), and that the amount of the contingent liability to be taken into account as debt is determined by the probability that the contingency will occur. In this case, the contingency the Bankruptcy Court evaluated was the cessation of TWA's operations and the termination of its business. The Bankruptcy Court rejected Travellers' contention that including such contingent liabilities was contrary to the going concern valuation required by Section 101(32) and concluded that under the orderly sale of assets approach, "[i]f TWA were required to wind down its operations and convert non-cash assets to cash in a 12 to 18 month period, its operations would obviously terminate and the liabilities contingent on that event would then become fixed." *Id.* at 427. In addition, the Bankruptcy Court rejected Travellers' assertion that TWA's SEC reports and press-releases were at odds with the conclusion that TWA's operations would cease. The Bankruptcy Court concluded that the SEC filings did not conflict with the testimony supporting inclusion of contingent liabilities and dismissed the press-releases as a "normal part of public relations." *Id.* at 428.

After reviewing tax liabilities and other liabilities that are not particularly relevant to this appeal, the Bankruptcy Court concluded that on November 4, 1991, the total of TWA's debts was $5,124,947,000. Comparing this debt figure to the previously ascertained asset value figure of $3,125,811,000 the Court determined that TWA was insolvent on November 4, 1991.

## DISCUSSION

### I. Jurisdiction and Standard of Review

Under 28 U.S.C. § 158(a), this Court has jurisdiction to hear appeals from final judgments, orders and decrees of bankruptcy judges. In reviewing a case on appeal, the bankruptcy court's factual determinations are subject to deference and shall not be set aside unless clearly erroneous. *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 641 (3d Cir.1991), *cert. denied.,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992), *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3d Cir.1988). However, a bankruptcy court's conclusions of law are subject to plenary review. *Metro Communications,* 945 F.2d at 641. Mixed questions of law and fact are subject to a "mixed standard of review" under which the appellate court accepts finding of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Id.* at 641–42 (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir. 1981)). While a determination of insolvency under Section 547 is treated as a factual finding, the standard to be employed in making the insolvency finding involves legal interpretation. *See Sierra Steel, Inc. v. Totten Tubes Inc. (In re Sierra Steel, Inc.),* 96 B.R. 275, 276–77 (9th Cir. BAP 1989). Therefore, the Court concludes that the insolvency issue

raised in this case is a mixed question of law and fact, in which the Court's review of the legal standard applied by the Bankruptcy Court to determine insolvency is plenary.

## II. Insolvency Under Section 547

In this appeal, Travellers challenges the Bankruptcy Court's ultimate conclusion that TWA was insolvent on the transfer date of November 4, 1991, as well as the holdings and findings of the Bankruptcy Court which led to this conclusion. The Court will divide Travellers' arguments into two categories, those pertaining to asset valuation and those applying to debt valuation. The Court will address each of Travellers' contentions in these areas.

### A. *Asset Valuation*

Regarding the asset valuation, Travellers argues that the Bankruptcy Court misconstrued the term "fair valuation" and committed legal error by employing an "orderly sale of assets to pay creditors" approach to the valuation determination. Travellers argues that TWA's inability to pay existing and potential liabilities by converting its assets to cash within 12 to 18 months is legal error for three reasons: (1) by utilizing an asset value obtained in a sale 12 to 18 months *after* the date of transfer, this test directly conflicts with the statutory mandate requiring a determination of the debtor's financial condition *on the transfer date*, (2) the application of this test leads to such arbitrary determinations as finding that 12 to 18 months constitutes a reasonable time, and (3) the application of this test results in a forced sale or liquidation approach, which conflicts with the requirements of prevailing authorities that assets be valued on a going concern basis and ascribed their fair market value.

In response, TWA argues that the Bankruptcy Court's approach to asset valuation, which requires a determination of the funds which could be generated by converting non-cash assets into cash within a reasonable time, is properly supported by case law and the policy underlying preference questions, specifically, ensuring equality of distribution among creditors.

Generally, in conducting asset valuation for insolvency determinations, the fair market value of assets is to be used, rather than a forced sale value. *See In re Taxman*, 905 F.2d 166, 169 (7th Cir.1990); *Edward R. Bacon Company v. Grover*, 420 F.2d 678, 678 (9th Cir.1970); *Roemelmeyer v. Walter E. Heller & Company (In the Matter of Lackow Brothers, Inc.)*, 752 F.2d 1529 (11th Cir. 1985); Daniel R. Cowans *Bankruptcy Law and Practice* 294 (6th ed. 1994). Forced sale or liquidation values only apply where the debtor is "wholly inoperative, defunct, or dead on its feet." *See In re Taxman*, 905 F.2d at 169; *In re Bellanca Aircraft Corp.*, 56 B.R. 339, 386–87 (Bankr.D.Minn.1985); *Roeder v. Alleman (In re Davis)*, 120 B.R. 823, 825 (Bankr.W.D.Pa.1990); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.)*, 100 B.R. 127, 130 (Bankr.D.Mass.1989); Cowans, *supra* at 295.

In this case, the Court is persuaded that the Bankruptcy Court's approach of valuating assets on the basis of a sale within a 12 to 18 month time frame is not a liquidation sale, as Travellers contends, but rather, this approach is within the realistic framework required for a fair valuation. *Total Technical Services, Inc. v. Whitworth*, 150 B.R. 893 (Bankr.D.Del.1993) (concluding that valuation of assets should occur within "realistic framework"). Numerous courts have accepted the proposition that "[f]air value, in the context of a going concern, is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *See Lawson v. Ford Motor Company (In re Roblin Industries, Inc.)*, 78 F.3d 30, 35 (2d Cir.1996); *In re R.M.L., Inc.*, 195 B.R. 602, 611 (Bankr.M.D.Pa.1996); *In re Sleepy Valley, Inc.*, 93 B.R. 925, 926 (W.D.Tex.1988); *In re Coated Sales, Inc.*, 144 B.R. 663, 667 (S.D.N.Y.1992). While the concepts of liquidation and fair market value may seem similar in that they potentially involve a "sale" scenario, the key difference is that fair market value involves a reasonable time frame. *See DuVoisin v. Anderson (In re Southern Industrial Banking Corporation)*, 71 B.R. 351, 356 (E.D.Tenn.1987) ("[F]air valuation is measured by a hypothetical liquidation of debtor's assets *over a rea-*

sonable period of time.") (emphasis added). Given the "reasonable period of time" requirement, fair valuation does not refer to the value of assets in either the worst or best circumstances. *In re Sleepy Valley,* 93 B.R. at 926; *DuVoisin,* 71 B.R. at 356. Therefore, the Court concludes that the Bankruptcy Court correctly rejected Travellers' contention that fair valuation should be free from all time constraints.

While Travellers' argument, that a sale 12 to 18 months after the transfer date clashes with the requirement that a solvency determination be made on the date of transfer, is compelling, it must be rejected as inconsistent with the prevailing view of fair value. To suggest that the hypothetical sale required for a determination of fair value must be conducted on the very date of the transfer, would, in itself, require a liquidation of the worst variety. A one-day sale on the date of transfer would clearly be a forced sale, which would yield far less amounts than could be obtained through the fair market value sale over a reasonable period of time. Therefore, the requirement that a solvency determination be made on the date of transfer must be reconciled with the fair market value requirement of a sale over a reasonable period of time.

■ While it is generally accepted that assets must be valued at the time of the transfer, few courts have examined the purpose underlying this requirement. From a review of the case law on this point, it appears the purpose of determining solvency on the transfer date is to avoid valuing assets based on the intervening bankruptcy.[2] Therefore, reconciling these points requires that the hypothetical sale over a reasonable period of time take into account the debtor's situation on the date of the transfer, and not the debtor's situation during the ensuing period of bankruptcy. Thus, while a 12 to 18 month time frame would realistically place the sale in the period of bankruptcy, because the sale is hypothetical, it must be based on the conditions at the time of transfer and not at the time of bankruptcy, as it would if one was realistically counting the 12 to 18 months. *See In re Coated Sales,* 144 B.R. at 668 (stating that "fair market valuation entails a hypothetical sale, not a hypothetical company").

■ Lastly, given the factual circumstances underlying this case, the Court cannot say that the Bankruptcy Court's decision to ascribe 12 to 18 months to the concept of "a reasonable time" was erroneous. Moreover, because a determination of which values most accurately reflected the definition of fair market value involved credibility determinations concerning expert witnesses, the Court cannot say that the Bankruptcy Court's decision to adopt TWA's figures, instead of Travellers' figures, was clearly erroneous. For these reasons, the Court concludes that the Bankruptcy Court correctly defined fair market value and correctly selected the asset valuations that were most credible and most closely aligned with the prevailing definition of fair market value.

### B. Debts

#### 1. Liability Valuation In General

■ Regarding the treatment of liabilities by the Bankruptcy Court, Travellers contends that it was legal error for the Bankruptcy Court to value TWA's contingent liabilities and its public debt at full value. Rather, Travellers argues that like assets, liabilities should be evaluated at their fair market value, rather than at their face value.

TWA argues that the Bankruptcy Court correctly valued liabilities at their face value.

---

**2.** *See Mellon Bank v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.,* 92 F.3d 139, 155 (3d Cir.1996) (discouraging the use of hindsight in asset valuation); *In re Lackow,* 752 F.2d at 1531 (affirming district court's decision that use of liquidated value of collateral obtained from an actual sale over six months after the filing of bankruptcy was inaccurate for determination of whether creditor's loan was secured during 90 day period prior to filing of bankruptcy petition in preference action); *In re*

*Total Technical Services, Inc.,* 150 B.R. at 900 ("Fair value is based upon information available to the parties during the preferential time period, and not upon information that only became available after the filing of the bankruptcy petition."); *In re Coated Sales Inc.,* 144 B.R. at 667 ("[A] company's assets must be valued at the time of the alleged transfer and not at what they turned out to be worth at some time after bankruptcy intervened.").

To support its position, TWA argues that the Section 101(12) definition of "debt," as liability on a claim, requires that liabilities be valued at face value. TWA also adopts the Bankruptcy Court's decision that the plain meaning of Section 101(32), which defines insolvency, requires that only assets be fairly evaluated.

Section 101(32) describes the test for insolvency as whether "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." Given this definition, this debate centers on whether the modifier "at a fair valuation" should apply to both "debts" and an "entity's property" or assets. In *Mellon Bank*, the Court of Appeals for the Third Circuit discussed the definition of insolvency in the context of Section 548, which provides for avoidance of fraudulent transfers. In applying the "balance sheet" test of insolvency, the court stated unequivocally that "*assets and liabilities are tallied at fair valuation to determine whether the corporations debts exceed its assets.*" 92 F.3d at 153 (citing *Metro Communications, Inc.*, 945 F.2d at 648 and adopting *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir.1988) for proposition that "the asset *or liability* must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities.") (emphasis added).

In its opinion, the Bankruptcy Court discounted Travellers' use of *Metro Communications* for this proposition, finding that the statement was taken out of context because *Metro Communications* "involved the consideration of the assessment of a debtor's portion of an obligation shared by other obligors." *Trans World Airlines*, 180 B.R. at 422. The Court is unable to agree with this reasoning. Both *Metro Communications* and the recent opinion in *Mellon* involved the application of the definition of insolvency to the avoidance of fraudulent transfers described in Section 548. Although somewhat different in their specific requirements and theories, Section 547 and Section 548 are essentially avoidance powers of the trustee, used to retrieve dispositions in order to promote equality among creditors. *See general-*

*ly*, Cowans, *supra* at 254–327 (1994). Because both sections contain an insolvency prong, they both implicate Section 101(32) and its balance sheet test. To ensure consistent application of defined terms to related portions of the Code, the same definition of insolvency should apply to both Section 547 and 548. Therefore, as the Third Circuit has stated in interpreting insolvency, the Court concludes that liabilities, as well as assets, should be tallied at fair valuation.

### 2. Contingent Liabilities

■ Regarding contingent liabilities, Travellers' argues that it was error for the Bankruptcy Court to view liabilities within the context of liquidation. For example, in calculating the liability amount resulting from pension plans and medical and dental benefits, Travellers contends that the Bankruptcy Court proceeded on the assumption that TWA was liquidating. Absent a liquidation premise, Travellers argues that liabilities resulting from termination of pension plans and wind-down expenses would not result, and the liability connected to medical and dental benefits would be offset by a corresponding amount reflecting a good will value that would be ascribed to a continuing business. Moreover, Travellers argues that given TWA's SEC filings and press releases, the Bankruptcy Court committed error by concluding that it was likely that the contingency of termination would be met. In response, TWA argues that the Bankruptcy Court's finding that TWA was going to cease operations without a restructuring and reduction of its massive debt load was not clearly erroneous.

■ The law is well-established that contingent liabilities are to be considered and valued for the purpose of determining whether a debtor was insolvent on the date of a preferential or fraudulent transfer. *Mellon Bank*, 945 F.2d at 648. In evaluating contingent liabilities, the Bankruptcy Court correctly stated: "The amount of the contingent liability to be taken into account as a "debt" is determined by "the probability that the contingency will occur and the liability will become real." *Trans World Airlines*, 180 B.R. at 427 (citing *Xonics Photochemical*, 841 F.2d at 200). Because the Bankruptcy

Court found significant factual support for its finding that absent a major capital restructuring, TWA was likely to terminate its business, this Court cannot say that the finding was clearly erroneous.[3]

### 3. The Publicly Traded Debt

Regarding the Bankruptcy Court's decision to ascribe full value to TWA's publicly traded debt securities, Travellers argues that the Bankruptcy Court committed error in two ways. First, Travellers contends, as discussed above, that under the "balance sheet test," liabilities should be reduced to their fair market value. In addition, Travellers argues that the Bankruptcy Court's finding that TWA did not have an agreement with its debt holder to eliminate $1 billion in debt was clearly erroneous, given the evidence contained in SEC filings and press releases. Moreover, given the statements in TWA's bankruptcy petition, itself, Travellers argues that TWA is judicially estopped from denying that it had an agreement.

As discussed above in the section on contingent liabilities, this Court cannot overturn the Bankruptcy Court's factual findings unless they are clearly erroneous. Thus, while Travellers' presents evidence that suggests that TWA had an agreement to reduce its debt, this Court cannot say that the Bankruptcy Court's finding that no agreement existed was clearly erroneous. However, because the Court has concluded that liabilities should be fairly evaluated, the Court does conclude that the Bankruptcy Court's decision to value the public debt at face value was error.

### C. *Request for Jury Trial*

Finally, despite this Court's denial of its motion to withdraw the adversary proceeding from the Bankruptcy Court for a jury trial and the Third Circuit's denial of Travellers' petition for a writ of mandamus on the issue, Travellers reasserts its argument that it is entitled to a jury trial in this action. TWA

correctly points out that the Court of Appeals for the Third Circuit has already addressed and disposed of Travellers' argument.

In *Travellers International AG v. Robinson,* 982 F.2d 96 (1992), the Court of Appeals denied Travellers' petition for a writ of mandamus and held that Travellers waived its right to a jury trial when it filed a proof of claim against the bankrupt estate of TWA. Thus, this Court cannot provide further relief, on the jury question.

### CONCLUSION

In sum, the Court concludes that the Bankruptcy Court properly valued TWA's assets in accord with the prevailing notions of fair market value. However, the Court concludes that the Bankruptcy Court erred in failing to value TWA's liabilities at their fair value. Therefore, the Court reverses that portion of the Bankruptcy Court's decision and remands the matter for further consideration consistent with this Opinion.

An appropriate order will be entered.

---

**3.** In finding that, as of November 4, 1991, TWA was a financially distressed entity in an industry in crisis, the Bankruptcy Court provided detailed factual support relating to the airline industry, generally, and TWA, specifically. *Trans World Airlines,* 180 B.R. at 412–13. The Bankruptcy

Court also accepted the views of TWA's accountants who "expressed substantial doubt as to whether the going concern assumption could be sustained" and rejected "public pronouncements of optimism" as a "normal part of public relations." *Id.* at 428.